**BRONX CHRYSLER PLYMOUTH, INC.; Westchester Dodge, Inc.; John Paladino; and Delores Paladino, Plaintiffs,**

v.

**CHRYSLER CORPORATION; Chrysler Credit Corporation, Donald Miltz; and Robert Declemente, Defendants.**

No. 98 Civ. 6141(GEL).

United States District Court, S.D. New York.

June 17, 2002.

Russell J. Shanks, Ellenoff, Grossman, Schole & Cyruli, LLP, New York City, for John Paladino and Delores Paladino.

William DiSalvatore, Hale and Dorr LLP, New York City (George W. Mykulak and Vinita Ferrera, Hale and Dorr LLP, Boston, MA, on the brief), for Defendant Chrysler Corporation.

Richard C. Maider (Jonathan D. Deily, on the brief), Deily, Dautel & Mooney, LLP, Albany, NY, for Chrysler Credit Corporation.

*OPINION AND ORDER*

LYNCH, District Judge.

This action arises from allegations that the defendants unlawfully coerced the plaintiffs into closing two car dealerships. While the plaintiffs originally asserted seven claims against the four defendants named in the complaint, a number of those claims were dismissed by this Court on September 20, 2000, and the parties have stipulated to the dismissal of several others. *See Bronx Chrysler Plymouth, Inc. v. Chrysler Corp.,* No. 98 Civ. 6141(DAB) (JCF), Report & Recommendation, at 4–5, 19–20 (S.D.N.Y. Aug. 31, 2000) (adopted

Sep. 26, 2000) ("R & R"); Chrysler Credit Aff. Ex. C (stipulation of dismissal with prejudice dated Oct. 9, 2001).

There remain in this action three claims asserted by the individual plaintiffs, John Paladino ("Paladino") and Delores Paladino ("Mrs. Paladino"), against defendants Chrysler Corporation ("Chrysler") and Chrysler Credit Corporation ("Chrysler Credit"),[1] and various counterclaims asserted by Chrysler and Chrysler Credit against the Paladinos. Chrysler and Chrysler Credit now move for summary judgment pursuant to Fed.R.Civ.P. 56 in their favor on all of the Paladinos' claims and Chrysler's counterclaims.[2] For the reasons that follow, the defendants' motions will be granted.

## BACKGROUND

A. *Factual Background*

Chrysler is a motor vehicle manufacturer that sells new vehicles, parts, and accessories to independent, authorized dealers. Bronx Chrysler Plymouth, Inc. ("Bronx Chrysler") was once such a dealer. In December 1977, Chrysler and Bronx Chrysler entered into a Dealer Sales and Service Agreement (the "Bronx Franchise Agreement") that authorized Bronx Chrysler to operate a Chrysler–Plymouth dealership in the Bronx. John Paladino was an officer, a director, and the sole shareholder of Bronx Chrysler. (Chrysler 56.1 Stmt. ¶ 1; Chrysler Credit 56.1 Stmt. ¶ 1–3.) The sole source of financing for that dealership was provided by Chrysler Credit, a wholly-owned but independently-oper-

ated subsidiary of Chrysler. (John Paladino Aff. ¶ 5.)

According to Paladino, the defendants informed him sometime in 1991 that they wanted him to relocate his dealership from the Bronx to Westchester County. When Paladino expressed some reluctance, Chrysler and Chrysler Credit allegedly took a number of coercive steps that Paladino maintains were intended to force him to relocate the dealership. Chrysler, for example, allegedly refused to approve Paladino's requests for additional model lines and refused to provide Bronx Chrysler with a proper allocation of popular vehicle models, instead "dumping" less popular vehicles on the Bronx Chrysler dealership. (John Paladino Aff. ¶ 3.) At the same time, Chrysler allegedly provided some of Bronx Chrysler's closest competitors with extensive financial assistance, including preferred leases and real estate arrangements, advertising subsidies, relocation and renovation expenses, preferred financing arrangements, forgiveness or forbearance of monetary obligations owed to the defendants, preferred vehicle allocations, outright monetary grants, the approval of additional model lines for sale, and preferential rebates on vehicle sales. (John Paladino Aff. ¶ 4.)

For its part, Chrysler Credit allegedly pressured Paladino by changing its lending requirements for Bronx Chrysler. Previously, Chrysler Credit had required Bronx Chrysler to sell cars to consumers using "recourse" credit terms, which provided that in the event of consumer default, Bronx Chrysler was obligated to repur-

---

1. Chrysler is now known as DaimlerChrysler Corporation, and Chrysler Credit is now known as Chrysler Financial Company L.L.C.

2. Chrysler Credit has not sought summary judgment on its counterclaim, which seeks to enforce the terms of the Continuing Personal Guaranty and claiming that the Paladinos are

jointly and severally liable in the amount of $729,386.67, as of June 12, 1998, plus interest, as well as reasonable attorneys' fees and costs. (Chrysler Credit Ans., Counterclaim ¶¶ 23–34.) Rather, Chrysler Credit has elected to "reserve its rights" with respect to that counterclaim. (Chrysler Credit Notice of Motion at 2.)

chase from Chrysler Credit only those automobiles that had been repossessed by Chrysler Credit and delivered back in good working order. When Paladino indicated his reluctance to relocate the dealership, Chrysler Credit changed its credit terms and required Bronx Chrysler to sell vehicles on "full repurchase" terms, which left the dealership fully liable for any consumer default regardless of whether Chrysler Credit ultimately repossessed the vehicle. (John Paladino Aff. ¶ 5.) Chrysler Credit also allegedly stopped providing Bronx Chrysler with access to the revolving loan the dealership had used to purchase inventory and imposed other consumer financing terms that allegedly hurt Bronx Chrysler's largely low-income consumer base. (John Paladino Aff. ¶ 6.) Chrysler Credit personnel also made comments expressing the lender's view that Paladino should "get out of the Bronx" because the Bronx Chrysler dealership was "deal[ing] with garbage" and "deal[ing] with trash" at that location. (John Paladino Aff. ¶ 5; John Paladino Dep. at 26–27.)

Paladino maintains that as further inducement for him to relocate the dealership to Westchester, the defendants represented that they would forgive the indebtedness that Bronx Chrysler had accrued, a debt totaling approximately $500,000. (John Paladino Aff. ¶ 7; Pl. Resp. to Chrysler 56.1 Stmt. ¶¶ 6, 10.) Allegedly in reliance on that promise, Paladino decided to close Bronx Chrysler, whose financial situation had badly deteriorated. He terminated the Bronx Franchise Agreement in October 1992 and proceeded to negotiate the purchase of a Chrysler dealership located in New Rochelle, New York. (Chrysler 56.1 Stmt. ¶ 1; Chrysler Credit 56.1 Stmt. ¶ 1–3; John Paladino Aff. ¶ 7–8.) While Paladino claims that the defendants promised to finance the full purchase price of the Westchester dealer-

ship, Chrysler ultimately lent him only $250,000 (Ferrera Aff. Ex. 2 ("WDI Security/Capital Loan Agreement"); John Paladino Dep. at 110), leaving him to find additional funds by taking a home equity loan and borrowing more than $100,000 from his children. (John Paladino Aff. ¶ 8; Chrysler 56.1 Stmt. ¶¶ 5–6.)

In exchange for lending Paladino the money to purchase the Westchester dealership, Chrysler sought and obtained a personal guaranty from Paladino and his wife, Delores Paladino, for the loan and any future debts that Paladino's new dealership, Westchester Dodge, Inc. ("WDI"), might incur. Ferrera Aff. Ex. 4 ("Continuing Personal Guaranty"). Chrysler also agreed to forbear any immediate efforts to collect the outstanding Bronx Chrysler debts, for which Paladino acknowledged being personally liable, in order to permit Paladino to commence operation of the new dealership without the immediate burden of repaying those debts. In return, the Paladinos and WDI agreed to execute and deliver a promissory note to Chrysler in the principal amount of $352,934.98. (Ferrera Aff. Ex. 5 ("Chrysler Forbearance Agreement"); Ferrera Aff. Ex. 6 ("Chrysler Promissory Note").) The Paladinos and WDI agreed to enter into a similar forbearance agreement with Chrysler Credit and to execute and deliver to Chrysler Credit two promissory notes, one in the amount of $300,000 and one in the amount of $250,000. (Miltz Aff. Ex. A ("Chrysler Credit Forbearance Agreement" and "Chrysler Credit Promissory Note"); Chrysler 56.1 Stmt. ¶ 8.) These forbearance agreements and promissory notes were executed by the parties on June 2, 1993. (Chrysler 56.1 Stmt. ¶ 9.)

The plaintiffs maintain that all of these agreements were entered in the face of the defendants' refusal to honor their previous

promise to forgive Bronx Chrysler's debts. According to Paladino, the defendants informed him – after the transaction to purchase the Westchester dealership already had closed – that they would not open the new dealership's credit lines unless the Paladinos personally executed notes acknowledging the Bronx Chrysler debt and agreed to terms for repayment. (John Paladino Aff. ¶ 8; Pl. Resp. to Chrysler 56.1 Stmt. ¶¶ 12–13.) While Paladino objected to the execution of these notes, he maintains that he had no choice but to accede to the defendants' terms, since he already had purchased the new Westchester dealership. (John Paladino Aff. ¶ 9.) Had the defendants not promised to forgive Bronx Chrysler's debt and "properly finance" WDI, Paladino asserts, he never would have agreed to close Bronx Chrysler and open the new Westchester dealership. (John Paladino Aff. ¶ 9; Pl. Resp. to Chrysler 56.1 Stmt. ¶ C.11.)

Nevertheless, upon the conclusion of these various agreements, Chrysler and WDI proceeded to execute a new Dealer Sales and Service Agreement (the "WDI Franchise Agreement"). (Ferrera Aff. Ex. 7–8.) Paladino was the sole shareholder of WDI, which commenced operations on June 7, 1993. (Chrysler 56.1 Stmt. ¶ 10; Chrysler Credit 56.1 Stmt. ¶¶ 7–9; John Paladino Dep. at 25.) Mrs. Paladino served as secretary and treasurer of WDI, but primary decision-making responsibility rested with her husband and the dealership's comptroller. (Maider Aff. Ex. F ("Delores Paladino Dep."), at 16–17.) Unfortunately, WDI too suffered from financial difficulties. (Chrysler 56.1 Stmt. ¶ 12.) As he acknowledges, Paladino contributed to those financial difficulties by causing the dealership to pay his personal debts and to pay a salary to Mrs. Paladino of approximately $150,000 per year when she performed no work. (Chrysler 56.1 Stmt. ¶ 49.)

However, Paladino alleges that the defendants played a substantial role in WDI's financial demise by engaging, once again, in punitive, discriminatory, and threatening practices. According to Paladino, Chrysler again denied his dealership the proper allocation of popular vehicles, causing WDI to lose business to competitors that were allocated those vehicles, and placed WDI at the lowest tier of its dealer customer satisfaction incentive program, which entitled WDI to receive an incentive of only $75.00 for each car sold, rather than the $300.00 received by dealers at the highest tier. (John Paladino Aff. ¶ 10–11.) While the defendants were contractually entitled to conduct periodic audits to determine the dealership's compliance with its contractual obligations, Paladino alleges that the defendants were selective and arbitrary in their auditing practices, requiring full compliance from WDI while tolerating substantial compliance from other dealers, and in one instance refusing to reschedule an audit on the day of the funeral of Paladino's stepson. (Chrysler 56.1 Stmt. ¶ 40; Chrysler Credit 56.1 Stmt. ¶ 24; John Paladino Aff. ¶ 12.) Paladino maintains that the defendants not only wrongfully denied WDI and its customers access to credit, but also provided considerable financial assistance to other unprofitable dealers in the area. (John Paladino Aff. ¶¶ 13–15.) Finally, Paladino asserts that Chrysler Credit personnel interfered with his operation of WDI, telling WDI employees that WDI soon would be out of business and, in a series of statements to Paladino, threatening to terminate WDI and even to foreclose on the Paladinos' home. (John Paladino Dep. at 561, 594–96, 687).

In February 1997, WDI filed a petition for bankruptcy protection under Chapter 11, voluntarily terminated the WDI Franchise Agreement, and ultimately sold the

dealership's assets. (Chrysler 56.1 Stmt. ¶ 15.)

### B. *Procedural History*

On July 22, 1998, the Paladinos filed this action in New York State Supreme Court, Bronx County; the defendants removed the case to federal court on August 21, 1998. The plaintiffs filed an Amended Complaint on October 13, 1998. On June 30, 1999, the bankruptcy trustee for WDI sold the debtor's right, title, and interest in all claims against the defendants to Chrysler Credit, which led to a stipulation dismissing with prejudice all of WDI's claims in this action. The plaintiffs accordingly filed a Second Amended Complaint on September 21, 1999.

The defendants then moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss all of the claims in the complaint. Adopting a Report and Recommendation ("R & R") prepared by Magistrate Judge James C. Francis IV, the Court (per Judge Deborah A. Batts) dismissed a number of the claims asserted in the Second Amended Complaint as time-barred and for failure to state a claim. The Court also held, however, that three of those claims were properly alleged and survived to the extent that they may have accrued within the applicable limitations periods – i.e., after July 22, 1995:(1) Chrysler's failure to act in good faith in performing or complying with written franchise agreements in violation of the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–25 (Second Amend. Compl. ¶¶ 90–100); (2) the intentional infliction of emotional distress upon the Paladinos by both Chrysler and Chrysler Credit in violation of New York law (Second Amend. Compl. ¶¶ 77–81); and (3) the breach of a duty of good faith owed the Paladinos by both Chrysler and Chrysler Credit in violation of New York law (Second Amend. Compl. ¶¶ 82–85). (R & R at 8–10.)

The parties have completed discovery, and the defendants now move for summary judgment on the remaining three claims in the Second Amended Complaint and three counterclaims asserted by Chrysler seeking payment of the debts incurred by Bronx Chrysler and WDI for which the Paladinos allegedly are liable.

### DISCUSSION

When adjudicating a motion for summary judgment, all ambiguities must be resolved in favor of the nonmoving party, although "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To establish a genuine issue of material fact, the plaintiff " 'must produce specific facts indicating' that a genuine factual issue exists." *Scotto,* 143 F.3d at 114 (quoting *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations

omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Pocchia v. NYNEX Corp.*, 81 F.3d 275, 277 (2d Cir.1996) (quoting *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505).

## I. The Paladinos' Claims

### A. *Automobile Dealers' Day in Court Act* [3]

The Automobile Dealers' Day in Court Act ("ADDCA"). 15 U.S.C. §§ 1221–25, "is a remedial statute enacted to redress the economic imbalance and unequal bargaining power between large automobile manufacturers and local dealerships, protecting dealers from unfair termination and other retaliatory and coercive practices." *Maschio v. Prestige Motors*, 37 F.3d 908, 910 (3d Cir.1994). ADDCA permits a car dealer to sue a manufacturer for its failure "to act in good faith in performing or complying with any of the terms of the franchise, or in terminating, canceling or not renewing the franchise with [the] dealer." 15 U.S.C. § 1222. The statute confers a right of action upon "automobile dealer[s]," *id.*, and defines that term to mean "any person, partnership, corporation, association, or other form of business enterprise ... operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons." 15 U.S.C. § 1221(c).

In its September 2000 order, the Court held that since Mrs. Paladino lacked any interest in WDI, she lacked standing to assert a claim under ADDCA. (R & R at 14.) However, the Court also concluded that Paladino properly stated a claim for relief against Chrysler under ADDCA to the extent that (1) the claim may have accrued after July 22, 1995, and therefore within the three-year ADDCA statute of limitations, 15 U.S.C. § 1223; and (2) Paladino might be able to adduce facts that establish his standing to sue under ADDCA. (R & R at 8–9, 14, 17–18.) Chrysler now argues that (1) Paladino lacks standing to assert a claim under ADDCA; (2) the ADDCA statute of limitations bars consideration of any of Chrysler's conduct before July 22, 1995; and (3) the allegations of coercion or intimidation by Chrysler are insufficient to support a claim under ADDCA.

### 1. *Standing*

■ Under normal principles of corporate law, it would appear that Paladino lacks standing to pursue claims under the ADDCA. As noted above, the Act provides remedies for "automobile dealer[s]," defined as persons or entities "operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons." 15 U.S.C. § 1221(c). As defendants point out, Paladino is not a party to any "franchise"; rather, the party to the relevant franchise agreement is WDI, which is no longer pursuing any claim against defendants. Accordingly, defendants argue, Paladino as an individual simply has no rights under ADDCA. (Chrysler Mem. at 7–9.) Paladino argues, however, that he falls within a recognized exception to these principles, unique to the specific statutory scheme of ADDCA. As more fully discussed below, Paladino's argument fails, because the law of the Second Circuit does not recognize the exception he cites.

**3.** As they did when opposing the defendants' motion to dismiss, *see* R & R at 16 n. 7, the plaintiffs refer to both defendants when discussing Paladino's ADDCA claim in their memorandum of law. In fact, the complaint only alleges that claim against Chrysler. There is thus no pending claim under ADDCA against Chrysler Credit.

Generally, a dealership doing business in a corporate form has exclusive standing to assert a claim under ADDCA – individual shareholders, officers, and directors of a corporate dealership ordinarily lack standing. *See Vincel v. White Motor Corp.*, 521 F.2d 1113, 1119–20 (2d Cir.1975); *Lewis v. Chrysler Motors Corp.*, 456 F.2d 605, 606–07 (8th Cir.1972) ("Unquestionably, the Act does not apply until a manufacturer-dealer relationship has been created."); *York Chrysler–Plymouth, Inc. v. Chrysler Credit Corp.*, 447 F.2d 786, 790 (5th Cir. 1971) (individuals' roles as stockholders, officers, or directors of corporate franchise holder do not place them within the scope of ADDCA). Paladino maintains that although he is not a party to the WDI Franchise Agreement, he nevertheless has standing under ADDCA because the terms of the WDI Franchise Agreement placed "special and significant reliance" on his personal involvement and active management of the new Westchester dealership. (Pl. Mem. in Opp. at 17 (citing *York Chrysler–Plymouth, Inc.*, 447 F.2d at 790).)

■ A number of courts have recognized exceptions, along the lines that Paladino urges, to the general rule that individual shareholders, officers, and directors of a corporate dealership lack standing under ADDCA. *See Lewis*, 456 F.2d at 607 (denying motion to dismiss for lack of standing because evidence might "reveal that the course of conduct pursued by the parties is such that, in light of all surrounding circumstances and the object to be accomplished as viewed from the purpose of the parties' association and underlying written agreements," plaintiff acted as an "automobile dealer" within meaning of ADDCA and defendant considered him as such); *York Chrysler–Plymouth, Inc.*, 447 F.2d at 790–91 (permitting two individuals who were sole shareholders, officers, and directors of dealer to sue under ADDCA where those individuals were "inextricably woven" into the franchise agreement and

"made essential to the operation of the dealership" by the terms of the agreement); *Kavanaugh v. Ford Motor Co.*, 353 F.2d 710, 716–17 (7th Cir.1965) (holding that sole individual shareholder and operator of dealer is "automobile dealer" and therefore has standing under ADDCA where that individual "was deemed essential to the operation of the dealership" and the manufacturer owned all of the franchise's voting stock and controlled its board of directors); *see also Rea v. Ford Motor Co.*, 497 F.2d 577 (3d Cir.1974) (applying *York Chrysler–Plymouth*); *Empire Volkswagen v. World–Wide Volkswagen*, 627 F.Supp. 1202, 1211 (S.D.N.Y.1986) (noting exceptions identified in *Kavanaugh* and *York Chrysler–Plymouth*, but finding neither exception applicable), *aff'd*, 814 F.2d 90 (2d Cir.1987).

In *York Chrysler–Plymouth*, the case upon which Paladino principally relies, the Fifth Circuit acknowledged that individuals do not have standing under ADDCA "merely because they [a]re sole stockholders, officers and directors of the corporate franchise holder," but nevertheless held that the individual shareholders in that case had standing because the franchise agreement "made [them] essential to the operation of the dealership." *York Chrysler–Plymouth*, 447 F.2d at 790. The franchise agreement in *York Chrysler–Plymouth* (1) provided that it was made in reliance "on the active, substantial and continuing participation" of the plaintiff shareholders, (2) required the individual shareholders to maintain beneficial ownership and control of the stock in the dealership corporation, and (3) permitted termination of the agreement if either of the plaintiff shareholders died or failed to continue in the active management of the dealership. *Id.* at 790–91.

The facts of this case fall squarely within the exception applied in *York Chrysler–*

*Plymouth.* The WDI Franchise Agreement is comparable in all material respects to the agreement at issue in *York Chrysler–Plymouth,* in some instances using identical language. The introduction to the WDI Franchise Agreement states that

[Chrysler] has entered into this Agreement in reliance upon and has placed its trust in the personal abilities, expertise, knowledge and integrity of [WDI's] principal owners and management personnel, which [Chrysler] anticipates will enable [WDI] to perform the personal services contemplated by this Agreement.

WDI Franchise Agreement, introduction. Section 2 of the WDI Franchise Agreement is even more explicit, stating that

[Chrysler] has entered into this Agreement relying on the active, substantial and continuing personal participation in the management of [WDI's] organization by ... John Paladino.

WDI Franchise Agreement § 2. The agreement also provides that Chrysler may terminate the agreement if Paladino either dies, fails "to continue active and substantial personal participation in the management" of the dealership, or transfers his ownership interest. WDI Franchise Agreement §§ 28(b)(iii)-(iv) & 34. Moreover, Paladino personally guaranteed WDI's indebtedness to the defendants, thereby making "his personal wealth ... substantially intertwined with the dealership's financial affairs." *Coffee v. General Motors Acceptance Corp.,* 5 F.Supp.2d 1365, 1379 (S.D.Ga.1998).

The undisputed facts therefore establish that Paladino was "essential to the operation" of WDI and would have standing as an "automobile dealer" to sue Chrysler under the exception applied in *York Chrysler–Plymouth,* if that case correctly states the law. However, *York Chrysler–Plymouth* appears to depart from the traditional corporate law rule that "where an injury is suffered by a corporation and the shareholders suffer solely through depreciation in the value of their stock, only the corporation itself ..., or a stockholder suing derivatively in the name of the corporation may maintain an action against the wrongdoer." *Vincel,* 521 F.2d at 1118 (citing *Niles v. New York Central & Hudson Riv. R.R. Co.,* 176 N.Y. 119, 68 N.E. 142 (1903)); *see Jones v. Niagara Frontier Transp. Auth.,* 836 F.2d 731, 736 (2d Cir. 1987) ("A shareholder – even the sole shareholder – does not have standing to assert claims alleging wrongs to the corporation."). Traditional corporate and bankruptcy law principles would deprive Paladino of standing to pursue WDI's ADDCA claim at least upon the dealership's bankruptcy filing – if not earlier – unless the bankruptcy trustee abandoned the claim, either voluntarily or upon order of the bankruptcy court, since a derivative claim brought by a shareholder but owned by the corporate debtor constitutes property of the bankruptcy estate under 11 U.S.C. § 541(a)(1). *See Mitchell Excavators, Inc. v. Mitchell,* 734 F.2d 129, 131–32 (2d Cir. 1984) (rights of action owned by debtor, including derivative claims brought by shareholders, "pass to the estate created by the commencement of the bankruptcy proceeding" and are "normally vindicated by the trustee" unless abandoned); *In re General Development Corp.,* 179 B.R. 335, 338–39 (S.D.Fla.1995).

Whether Congress intended with ADDCA to adopt traditional corporate law principles or instead to enact a more permissive set of standing rules turns on the interpretation of the definition of "automobile dealer" under the statute. *Compare* Mark Herrmann, *Identifying the Proper Plaintiff to Pursue Claims Under the Automobile Dealers Day in Court Act,* 24 Cap. U.L.Rev. 565, 565 n. 1, 577–79 (1995) (arguing that legislative history "provides no guidance" on circumstances in which

individual shareholders of corporate dealerships have standing under ADDCA and that traditional corporate law principles should govern), *with Kavanaugh,* 353 F.2d at 716–17 & n. 8 (broadly interpreting ADDCA's definition of "automobile dealer" and standing rules in light of statute's "fundamental purpose" of "remedy[ing] the manifest disparity in the ability of franchised dealers of automobile dealers to bargain with their manufacturers"); *Lewis,* 456 F.2d at 607 (concluding that ADDCA's definition of "automobile dealer" "should be given the construction that best serves the congressional purpose of 'supplementing the antitrust laws' and balancing 'the power ... heavily weighted in favor of automobile manufacturers' ").[4]

The Second Circuit's position on *York Chrysler–Plymouth* is not entirely clear. While Chrysler argues that *Vincel* rejected application of the *York* exception "on facts substantially similar to those present in this case," Chrysler Mem. at 8, *Vincel* did not expressly reject the reasoning of *York Chrysler–Plymouth,* instead somewhat cryptically distinguishing that case as one "in which the shareholders are joined with the corporation in a single action."

*Vincel,* 521 F.2d at 1120. Nor did *Vincel* expressly address consider the argument adopted by the Fifth Circuit in *York Chrysler–Plymouth* and pressed by Paladino in this case – namely, whether the franchise relationship that makes the plaintiff shareholders "essential to the operation of the dealership" renders those individual shareholders "automobile dealers" within the meaning of ADDCA and therefore entitles them to sue under the Act.

Nevertheless, neither the reasoning nor the result of *Vincel* can be reconciled with a finding of standing on Paladino's part. Vincel, like Paladino, was the president of the franchisee corporation, owned (with his co-plaintiffs) 100% of its stock, and personally guaranteed the corporation's debt to the manufacturer. 521 F.2d at 1115–16. Although the Court made no reference to any "essential to the operation of the dealership" clause in the franchise agreement, there is little question that Vincel, like the Yorks or Kavanaugh, was the human being who was the effective counterparty to the automobile manufacturer, and was thus not "merely ... someone who desired to invest in a business enterprise or ...

4. Courts have divided over whether to follow the Fifth Circuit's decision in *York Chrysler–Plymouth. Compare Rea v. Ford Motor Co.,* 497 F.2d 577 (3d Cir.1974) (applying *York Chrysler–Plymouth* ); *John Peterson Motors, Inc. v. General Motors Corp.,* 613 F.Supp. 887, 903 (D.Minn.1985); *Imperial Motors, Inc. v. Chrysler Corp.,* 559 F.Supp. 1312, 1314–15 (D.Mass.1983); *and Judice's Sunshine Pontiac, Inc. v. General Motors Corp.,* 418 F.Supp. 1212, 1221–22 (D.N.J.1976) *with Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429, 440 n. 11 (9th Cir.1979) (holding that provision permitting franchisor to terminate agreement if certain stockholders did not continue as principals in dealership corporation "was for the benefit of the [franchisor] and did not expand the parties to the agreement," and on that basis declining to follow *York Chrysler–Plymouth* ); *Olson Motor Co. v. General Motors Corp.,* 703 F.2d 284, 290 (8th Cir.1983)

(fact that individual shareholder guaranteed debts of corporation "do[es] not warrant departure from the general rule of separation of [individual and corporate] identities" and does not confer individual shareholder standing to bring suit under ADDCA (quoting *Sherman,* 601 F.2d at 439); *York Chrysler–Plymouth* distinguished by absence of "personal participation" clause in franchise agreement); *Salem Mall Lincoln Mercury, Inc. v. Hyundai Motor America,* No. C–3–95–231, 1998 WL 1572766, at *5 (S.D.Ohio Aug.18, 1998) (following *Sherman* ); *and Moorehead v. General Motors Corp.,* 442 F.Supp. 873, 879 (E.D.Pa. 1977) (rejecting *York Chrysler–Plymouth's* conclusion that "personal and substantial participation in both the ownership and operation of the dealership" confers standing on the individual owner or operator under ADDCA).

someone being employed to manage the dealership," *Kavanaugh,* 353 F.2d at 716, but the very sort of person in need of the protection Congress apparently intended to provide by enacting the ADDCA.

Notwithstanding these facts, the Second Circuit firmly rejected individual standing, at least where (as here and in *Vincel* ) the individual shareholder sues only in his own behalf, and not, as in *York Chrysler–Plymouth,* alongside the corporate franchisee itself.[5] The Court reached that result by setting out at length the traditional rules prohibiting shareholders from suing in their own names to enforce rights conferred on the corporation they own, 521 F.2d at 1118–19, and noting that the statutory claims under ADDCA "must also fail because any such claims belong to the corporation." *Id.* at 1119. Nor did the Court accept the argument that Congress intended the ADDCA to vary the normal rules of shareholder standing in order to effectuate the Act's purposes: "When, as here, a dealership is doing business in corporate form, the statute contains no hint that it intends a departure from the established principle that the locus of the right of action is the corporation." *Id.* at 1120.[6]

Thus, while *Vincel* does not expressly reject the holding of *York Chrysler–Plymouth,* it refuses to apply *York* on facts all but identical to those at issue here, on reasoning inconsistent with plaintiff's position in this case, and distinguishes *York* on

a fact of dubious relevance that is not present in this case. Under these circumstances, to hold that *York Chrysler–Plymouth* rather than *Vincel* provides the rule of decision in this case would be irresponsible. Second Circuit law thus precludes according standing to Paladino to pursue the instant claims.

### 2. *The Merits*

■ Even assuming arguendo that Paladino did have standing under ADDCA as an "automobile dealer," his claim fails on the merits in any event. At the outset, the Court notes that Paladino's ADDCA claim suffers from serious statute of limitations problems. "A claim under [ADDCA] accrues, and therefore, the statute of limitations begins to run, when the plaintiff knows or has reason to know that the act providing the basis for its injury has occurred." *Salem Mall Lincoln Mercury v. Hyundai Motor America,* 103 F.Supp.2d 1032, 1037 (S.D.Ohio 2000); *see Leon v. Murphy,* 988 F.2d 303, 309 (2d Cir.1993) ("[U]nder federal law, a cause of action accrues when the plaintiff. knows or has reason to know of the injury that is the basis of the action." (internal quotation marks omitted)). Paladino contends that Chrysler's actions constitute one continuous tort and, therefore, were "of a nature that the damages flowing therefrom could not have been ascertained until a later date." Pl. Mem. in Opp. at 20 (citing *Colonial Ford, Inc. v. Ford Motor Co.,* 577

---

5. Notably, in distinguishing *York Chrysler–Plymouth* on this ground, the Court chose *not* to identify the fact that the Yorks were contractually identified as "essential to the operation of the dealership," 447 F.2d at 790, as a meaningful distinction between *Vincel* and *York.*

6. The *Vincel* Court also distinguished *Kavanaugh,* noting that in that case the corporate structure of the dealership, under which the manufacturer retained all the voting stock,

effectively prevented the corporate franchisee from suing the manufacturer. 521 F.2d at 1120. In *Vincel,* as in this case, the absence of the corporation from the lawsuit resulted not from a corporate structure adopted from the outset "in order to defeat the legislative purpose of the act," *Kavanaugh,* 353 F.2d at 717, but rather from the facts that individual plaintiffs had lost control of the corporation, and that the corporate claims had been settled by the trustee in bankruptcy. 521 F.2d at 1120.

F.2d 106, 112 (10th Cir.1978), *reh'g granted on other grounds*, 592 F.2d 1126 (10th Cir.1979)); *see also Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1039 (2d Cir.1992) (continuing wrong doctrine protects plaintiff against the "impracticality and unfairness of requiring a plaintiff to institute his action before he can predict his damages"). He argues that since he closed Bronx Chrysler and purchased WDI in reliance on Chrysler's promise to forgive Bronx Chrysler's indebtedness and to support the new dealership in Westchester, he would not have had reason to know of the injuries resulting from Chrysler's entire course of conduct with him, including its failure to honor that earlier alleged promise, until WDI itself failed in 1997.

■ On the assumptions necessary to support standing, Paladino's argument has some appeal. Since his claim under ADDCA is premised on the notion that *he* is an "automobile dealer," with a direct claim to relief quite apart from any claims held by Bronx Chrysler or WDI, the fact that Paladino's factual allegations may be divided into two distinct phases, each involving a different corporate entity, is not *itself* relevant. Nevertheless, Paladino's argument fails. While a cause of action ordinarily does not accrue until "the plaintiff has a complete and present cause of action" and "can file suit and obtain relief," *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp.*, 522 U.S. 192, 201, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997) (internal quotes omitted), a plaintiff need not be aware of the full extent of the injuries suffered in order for the claim to accrue. *See Corcoran v. New York Power Authority*, 202 F.3d 530, 544 (2d Cir.1999) (in order for claim to accrue, plaintiff "need not know each and every relevant fact of his injury or even that the injury implicates a cognizable legal claim") (quoting *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir.1998)); *Mendez v. United States*, 655 F.Supp. 701, 705 (S.D.N.Y. 1987) ("To be aware of an injury, plaintiff need not know the full extent of his or her injury. The statute will run even though the ultimate damage is unknown or unpredictable." (internal quotation marks and citations omitted)). "Rather, a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice." *Corcoran*, 202 F.3d at 544 (quoting *Kronisch*, 150 F.3d at 121).

Unlike *Colonial Ford*, a case upon which Paladino heavily relies, this is not a situation in which the automobile manufacturer's pre-limitations period conduct was "of such a nature that damages could not have been ascertained until an extended period of time had elapsed." *Colonial Ford*, 577 F.2d at 112; *see also Kahn*, 970 F.2d at 1039. While Paladino asserts that the consequences of Chrysler's various pre-limitations period actions "could not have been known at the time," Pl. Mem. in Opp. at 21, the undisputed evidence demonstrates otherwise. Paladino clearly had reason to know the injuries caused by Chrysler's actions in connection with Bronx Chrysler and its extensive indebtedness as early as October 1992, when that dealership ceased operations and terminated its franchise agreement with Chrysler, and certainly no later than June 1993, when Chrysler allegedly reneged on its promise to forgive Bronx Chrysler's indebtedness and forced the Paladinos personally to guarantee those debts. The precise amount of Bronx Chrysler's indebtedness, after all, was known to everyone at the time. The fact that Paladino waited for those injuries ultimately to become more severe, as WDI proceeded to fall into ever-greater financial difficulties, is of no moment.

Similarly, Paladino's allegations concerning Chrysler's actions in connection with WDI before July 22, 1995, are also time-

barred, since Paladino had ample reason to know the consequences of those actions well before that date. If Chrysler's discriminated against WDI in implementing its customer satisfaction incentive programs, that discrimination necessarily would have taken place before July 1995, since it is undisputed that the incentive programs in question were discontinued in late 1994. (Chrysler 56.1 Stmt. ¶ 33–34, 37.) It is also undisputed that at least some of the instances in which Chrysler allegedly failed to allocate WDI the vehicle models to which Paladino claims it was entitled took place in 1993 and 1994 – approximately one year before the July 1995 cutoff date for the ADDCA limitations period. (Chrysler 56.1 Stmt. ¶ 28–31; John Paladino Dep. at 140–41, 147–48.) And in each case, any damages that Paladino may have suffered from those alleged actions by Chrysler reasonably could have been predicted within the limitations period.

■ Paladino's ADDCA claim therefore reduces to his allegations that Chrysler denied WDI the proper allocation of vehicle models in 1996, engaged in selective audits and enforcement of audits in 1995 and 1996, and wrongfully terminated the WDI Franchise Agreement. The evidence in support of these allegations is insufficient to withstand the Chrysler's motion for summary judgment. In order to prevail on his ADDCA claim, Paladino must prove that Chrysler failed to act in good faith in "performing or complying with any of the terms of the franchise, or in terminating, canceling or not renewing the franchise with [the] dealer." 15 U.S.C. § 1222. Under ADDCA, "good faith" – defined as "the duty of each party to any franchise, and all officers, employees or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion or intimidation from the other party," 15 U.S.C. § 1221(e) – has a "narrow, restricted

meaning." *Empire Volkswagen v. World–Wide Volkswagen,* 814 F.2d 90, 95 (2d Cir.1987); *see Carroll Kenworth Truck Sales, Inc. v. Kenworth Truck Co.,* 781 F.2d 1520, 1525 (11th Cir.1986) ("Bad faith under [ADDCA] has been defined narrowly and construed strictly. It does not mean simply a lack of fairness but entails a showing of coercion."). To establish the lack of good faith and therefore prevail under ADDCA, the dealer must provide "evidence of a wrongful demand enforced by threats of coercion or intimidation." *Empire Volkswagen v. World–Wide Volkswagen,* 814 F.2d at 95–96; *see Lazar's Auto Sales, Inc. v. Chrysler Financial Corp.,* 83 F.Supp.2d 384, 388 (S.D.N.Y. 2000) (to prevail under ADDCA, dealer must prove (1) that manufacturer "coerced, intimidated or threatened" the dealer and (2) that "any coercion or intimidation was designed to achieve some improper or wrongful objective"). A wrongful demand may be inferred "from all the facts and circumstances" even in the absence of evidence that a formal, explicit demand was made. *Marquis v. Chrysler Corp.,* 577 F.2d 624, 634 (9th Cir.1978).

Here, Paladino can establish neither that he was coerced or intimidated nor that Chrysler's objectives were improper or wrongful. First, contrary to Paladino's implication, ADDCA "does not afford [an automobile dealer] a statutory right or formula for allocation or delivery of certain cars." *Southern Rambler Sales, Inc. v. American Motors Corp.,* 375 F.2d 932, 935 (5th Cir.1967); *see also Colonial Dodge, Inc. v. Chrysler Corp.,* 11 F.Supp.2d 737, 744 (D.Md.1996) ("A manufacturer's duty toward a dealer is defined initially by its allocation agreement. A dealer is entitled only to the cars due under the allocation system, not to all the automobiles it requests."), *aff'd,* 121 F.3d 697, 1997 WL 436710 (4th Cir.1997) (table).

**246**

Paladino concedes that WDI's inability to obtain certain vehicle models in 1996 and prior years resulted from Chrysler's use of the so-called "turn and earn" system of allocation – a system that Chrysler uses with *all* of its dealers. (Chrysler 56.1 Stmt. ¶¶ 28–31.) Under the "turn and earn" system, a dealer is required to sell a certain number of a particular vehicle model in order to obtain a higher allocation of that model. Any dealer that needs additional vehicles in excess of its allocation must acquire those vehicles, if it can, from other dealers – indeed, Mr. Paladino acknowledges that in 1996, WDI did in fact obtain vehicles from other dealers in precisely this manner when it was unable to obtain them directly from Chrysler. (Chrysler 56.1 Stmt. ¶¶ 28–29, 31.) There is no evidence that Chrysler's use of the "turn and earn" system itself was coercive in this case. *Compare Fox Motors, Inc. v. Mazda Distributors (Gulf), Inc.*, 806 F.2d 953, 959–60 (10th Cir.1986) (noting that "the allocation of scarce vehicles based upon prior sales performance is generally permissible as a legitimate means of promoting competition through efficient distribution," but concluding that evidence supported ADDCA claim of discriminatory allocation since some dealers received allocations of popular vehicles without regard to prior sales). Since Paladino concedes that WDI's vehicle allocations were determined by the "turn and earn" system, Chrysler's allocation of vehicles to WDI and the Paladinos does not violate ADDCA.

Second, the undisputed evidence shows that the audits conducted by Chrysler were authorized by the WDI Franchise Agreement. The WDI Franchise Agreement authorized Chrysler to conduct audits in order to determine whether the dealership was in compliance with the requirements of the contract and the various programs in which WDI elected to participate; the agreement also gave WDI an opportunity to appeal auditors' findings. (Chrysler 56.1 Stmt. ¶ 40; WDI Franchise Agreement ¶ 11(b).) With respect to the two post-July 1995 audits at issue in this case – a December 1995 sales incentive audit and an August 1996 warranty audit – Paladino offers no evidence that Chrysler failed to act in good faith. It is undisputed that WDI had failed to "dot the Is [and] cross the Ts" and therefore was not in compliance with the terms governing the sales incentive program. (Chrysler 56.1 Stmt. ¶ 38; John Paladino Dep. at 156–58, 161.) Similarly, Paladino does not contest that fact that WDI had violated the terms of its franchise agreement by purchasing replacement parts on the open market for cars serviced under warranty claims, rather than purchasing and using only parts supplied by Chrysler, as the WDI Franchise Agreement required. (Chrysler 56.1 Stmt. ¶ 39; John Paladino Dep. at 166–67, 170, 173–74.) It was thus entirely reasonable for Chrysler to conduct audits of these functions, and it is undisputed that the audits uncovered breaches by WDI of its obligations to Chrysler.

Paladino nevertheless protests that Chrysler audits of WDI were arbitrary and discriminatory, since other dealers in the area were treated more leniently. But this allegation – even if true – fails to support an ADDCA claim. Even if Chrysler acted arbitrarily in its auditing practices, "mere arbitrariness on the part of a manufacturer does not constitute a violation of [ADDCA]." *Gage v. General Motors Corp.*, 796 F.2d 345, 351 (10th Cir. 1986). Paladino concedes that WDI had failed to comply with its contractual obligations and that Chrysler had the legal right to audit the dealership and assess charges for any contractual violations. Enforcing its rights, even if it chose to overlook similar violations by others, is not wrongful coercion under ADDCA.

Finally, it is undisputed that the WDI Franchise Agreement was terminated by WDI, not Chrysler. (Chrysler 56.1 Stmt. ¶ 5.) While Paladino protests that Chrysler was responsible for WDI's financial collapse and the resulting termination of the WDI Franchise Agreement, he points to no evidence indicating that coercion, threats, or intimidation by Chrysler against Paladino or anyone else brought about WDI's failure and termination of the franchise agreement. In short, there is no genuine factual issue that any of Chrysler's alleged actions, whether individually or considered as a whole, forms the basis of a valid claim under ADDCA. The undisputed evidence makes clear that Chrysler's conduct does not "indicate a design to force dealer termination or achieve some other [impermissible] objective," *Fox Motors, Inc.*, 806 F.2d at 960, but rather adds up to nothing more than the reasonable exercise and enforcement of its legal rights under the WDI Franchise Agreement. Summary judgment in Chrysler's favor on Mr. Paladino's ADDCA claim therefore will be granted.[7]

## B. *Intentional Infliction of Emotional Distress*

■ Under New York law, intentional infliction of emotional distress "predicates liability on the basis of extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded atrocious and intolerable in a civilized society." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143, 490 N.Y.S.2d 735, 480 N.E.2d 349 (1985). To prevail on their claim for inten-

tional infliction of emotional distress, the Paladinos must prove four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993).

■ In its September 2000 order, the Court held that the Paladinos could maintain their claim for intentional infliction of emotional distress to the extent that the claim may have accrued within the applicable limitations period. (R & R at 9–10.) While the Court previously held that the three-year limitations period set forth in C.P.L.R. 214(4) applied to this claim (R & R at 9–10), this conclusion was mistaken. As a claim involving an intentional tort, the Paladinos' claim against Chrysler Credit for intentional infliction of emotional distress is governed by the one-year limitations period set forth in C.P.L.R. 215(3). *See, e.g., Gallagher v. Directors Guild of America, Inc.*, 144 A.D.2d 261, 533 N.Y.S.2d 863, 864–65 (1st Dep't 1988). The claim is therefore timely only to the extent that it accrued after July 22, 1997. Since the last actionable event in this case – WDI's bankruptcy filing – took place on February 4, 1997, the Paladinos' claim is time-barred under C.P.L.R. 215(3).[8] Perhaps recognizing that the one-year statute of limitations period applies, Paladino now contends that the last actionable event is Chrysler Credit's purchase of

---

7. Because Paladino has failed to adduce facts in support of his ADDCA claim, we need not address Chrysler's additional contention (Chrysler Mem. at 14–15) that Paladino is barred from prosecuting his ADDCA claim because of his own lack of good faith.

8. Because the last actionable event in this action occurred outside the limitations peri-

od, Paladino gains nothing from his attempt to apply the continuing tort doctrine to the facts of this case. *See Shannon v. MTA Metro-North R.R.*, 269 A.D.2d 218, 704 N.Y.S.2d 208, 209 (1st Dep't 2000) (continuing tort doctrine permits plaintiff to rely upon wrongful pre-limitations period conduct "so long as the final actionable event occurred within" limitations period).

WDI's claims in this action from the bankruptcy trustee on June 30, 1999. (Pl. Mem. in Opp. at 21.) That assertion, however, is plainly without merit. Chrysler Credit's purchase of those claims took place almost one year after the complaint in this action was filed, and there is no evidence that its purchase of those claims was wrongful in any way – Chrysler Credit purchased WDI's claims at a public sale, and the purchase itself was approved by the bankruptcy court. (Maider Reply Aff. Ex. A.) In effect, the purchase of the claims amounts to a bankruptcy-court-approved settlement of WDI's claims against defendants. As a matter of law, such a settlement is not outrageous conduct, and its obvious commercial purpose precludes any argument that the action was maliciously intended to cause distress.

■ Even apart from any statute of limitations problem, however, the plaintiffs' claim of intentional infliction of emotional distress fails on the merits. The claim itself reduces to Paladino's allegations of a pattern of discriminatory conduct by the defendants, since it now is conceded that the defendants did not specifically direct any conduct against Mrs. Paladino, who was not a shareholder or officer of WDI.[9] Paladino alleges that the defendants threatened WDI and the Paladinos with termination of the dealership and foreclosure on the Paladinos' home; interfered with WDI's operations by terminating the dealership's credit line, engaging in excessive and intrusive audits, and telling WDI employees that the dealership was failing; imposed onerous lending terms upon the dealership's customers; and discriminated in favor of WDI's competitors by providing financial assistance to those dealerships. Assuming *arguendo* that Mr. Paladino's factual allegations are completely true – and the evidentiary support for his claims is rather thin – Chrysler Credit's conduct falls well short of the standard necessary to prevail.

For a plaintiff to prevail on a claim for intentional infliction of emotional distress, the defendants conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) (quoting *Restatement (Second) of Torts* § 46 cmt. d). Paladino's allegations fall woefully short of that standard. As he concedes, Paladino entered into an agreement that made him personally liable for the debts of his corporate dealerships, failed to make timely payments on the debts incurred by those dealerships, and even submitted inaccurate financial reports to Chrysler and Chrysler Credit during the time periods in question. (John Paladino Dep. at 560–68, 686–88; Chrysler Credit 56.1 Stmt. ¶ 20.) Especially given WDI's deteriorating financial situation, Mr. Paladino cannot be heard to complain now that the defendants decided to audit WDI and ultimately to suspend their financing – in accordance with their undisputed contractual rights (Chrysler 56.1 Stmt. ¶ 40; Chrysler Credit 56.1 Stmt. ¶ 24) – and that its personnel ·informed him that foreclosure on his house was a possibility if WDI's financial situation did not improve. Viewed in this con-

---

9. Chrysler maintains that only one factual allegation in support of this claim pertains to Chrysler – namely, Chrysler's alleged subsidies to other dealers, in the form of sales incentive program subsidies, before termination of that program in 1994. (Ferrera Aff. Ex. 21, at 7–10.) While defendants dispute which of them conducted the 1995 and 1996 audits of which Paladino complains, for purposes of this motion the Court will assume *arguendo* that the defendants acted jointly and can be treated interchangeably, since the claim for intentional infliction of emotional distress fails on the merits in any event.

text, the "threats" allegedly made by Chrysler Credit personnel, which consisted of statements to the effect that WDI was "running out of time [and] running out of money" and that if its financial situation did not improve, Chrysler Credit would "come in, throw [Paladino] out and lock the doors, take [his] demos and go after [his] house" (John Paladino Dep. at 561), may have been heavy-handed or even unfair, but they hardly constitute the "outrageous" and "atrocious" conduct necessary to support a claim of intentional infliction of emotional distress. Nor does Paladino provide any evidence that the defendants' conduct caused his health problems, which largely predate the alleged conduct by the defendants and about which no medical evidence has been produced in this case. (Chrysler 56.1 Stmt. ¶ 51; Chrysler Credit 56.1 Stmt. ¶¶ 31–32, 35.)

Summary judgment therefore will be granted in the defendants' favor on the Paladinos' claim for intentional infliction of emotional distress.

### C. *Breach of Contractual Duty of Good Faith*

Count IV of the complaint essentially restates the Paladinos' ADDCA claim on state common law grounds, asserting that the defendants owed the Paladinos a duty "to exercise ordinary and reasonable care to act in good faith in [their] business dealings and otherwise" and that the defendants' conduct constituted a breach of that duty. Second Amend. Compl. ¶¶ 83–84. However, the Paladinos do not identify the source of any such duty in their opposition papers to the defendants' motions for summary judgment – indeed, the Paladinos make no argument in support of this claim *at all*. Under the circumstances, the Court deems the claim abandoned and will dismiss it on that basis. *See Anyan v. New York Life Ins. Co.*, 192 F.Supp.2d 228, 237 (S.D.N.Y.2002) (dismissing ADEA claim as abandoned where plaintiff fails to address that claim in opposition papers to defendants' motion for summary judgment and presents no specific evidence that age was factor in termination of employment), *appeal docketed*, No. 02–7497 (2d Cir. May 2, 2002).

 Even if this claim were not abandoned, however, it would fail on the merits. Every contract governed by New York law contains an implied covenant of good faith and fair dealing, which "is violated when a party … acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under the agreement." [10] *Don King Prods., Inc. v. Douglas*, 742 F.Supp. 741, 767 (S.D.N.Y.1990); *see M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir.1990) (under implied covenant, "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract"). However, the im-

---

10. In its September 2000 order, the Court characterized the Paladinos' claim for breach of a duty of good faith as a claim sounding in tort. (R & R at 11–12.) That characterization, however, was mistaken, since under both New York and Michigan law, the doctrine of good faith and fair dealing functions as a principle of contract interpretation, not as an independent cause of action sounding in tort. *See, e.g., Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir.1992) ("Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." (internal quotation marks omitted)); *Village On Canon v. Bankers Trust Co.*, 920 F.Supp. 520, 534 (S.D.N.Y.1996) (under New York law, implied covenant does not provide "an independent basis for recovery"); *Ulrich v. Federal Land Bank of St. Paul*, 192 Mich.App. 194, 197, 480 N.W.2d 910 (1991) ("Michigan does not recognize an independent tort action for an alleged breach of a contract's implied covenant of good faith and fair dealing.").

plied covenant "can only impose … obligation[s] 'consistent with other mutually agreed upon terms in the contract.'" *Geren v. Quantum Chemical Corp.*, 832 F.Supp. 728, 731–32 (S.D.N.Y.1993) (quoting *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 335, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987)), *aff'd*, 99 F.3d 401 (2d Cir.1995) (table); *see M/A–COM Sec. Corp.*, 904 F.2d at 136 ("Integral to a finding of a breach of the implied covenant is a party's action that directly violates an obligation that may be presumed to have been intended by the parties."). While the implied covenant may be used "to protect a legitimate, mutually-contemplated benefit" of the contract, a party may not invoke this covenant "to have [the] Court create an additional benefit for which [the parties] did not bargain," *id.* at 732 (quoting *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F.Supp. 1504, 1519 (S.D.N.Y.1989)), or to impose obligations that would be inconsistent with express contractual provisions. *Metropolitan Life Ins. Co.*, 716 F.Supp. at 1517. Michigan law recognizes essentially the same rules as New York law concerning the implied covenant of good faith and fair dealing. *See, e.g., Stephenson v. Allstate Ins. Co.*, 141 F.Supp.2d 784, 793 (E.D.Mich.2001); *Van Arnem Co. v. Manufacturers Hanover*

*Leasing Corp.*, 776 F.Supp. 1220, 1222–23 (E.D.Mich.1991).

Applying New York choice of law rules, *see Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the contracts to which the Paladinos are parties[11] – the Continuing Personal Guaranty, the Chrysler Forbearance Agreement, the Chrysler Promissory Note, the Chrysler Credit Forbearance Agreement, and the Chrysler Credit Promissory Note – are all governed by either New York or Michigan law.[12] Under either New York or Michigan law, the defendants' conduct does not violate any implied covenant of good faith that might be read into these various contracts. The Continuing Personal Guaranty obligated the Paladinos to guarantee the debts of Bronx Chrysler; the terms of the other four agreements confirmed that obligation and set forth the terms under which those debts were to be repaid to the defendants. As discussed above with respect to the Paladinos' other claims, there is no evidence that the defendants did anything other than to vigorously pursue their contractual rights under their various agreements with the Paladinos, Bronx Chrysler, and WDI. Since neither Chrysler nor Chrysler Credit "engaged in any actions in vio-

11. As discussed above with respect to their claim under ADDCA, the Paladinos are not parties to the WDI Franchise Agreement. Any implied covenant of good faith and fair dealing that might be read into that agreement between WDI and Chrysler is therefore irrelevant to the claim asserted here by the Paladinos.

12. The Chrysler Forbearance Agreement and the Chrysler Promissory Note contain express choice of law clauses providing that Michigan law governs, while the Chrysler Credit Forbearance Agreement and Chrysler Credit Promissory Note both provide that New York law governs. *See Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir.1996) ("New York law gives full effect to parties' choice of law provi-

sions."). The fifth contract, the Continuing Personal Guaranty, purports to confer exclusive jurisdiction and venue on courts within the state of Michigan, but contains no choice of law provision. As just discussed, however, New York and Michigan recognize essentially the same rules concerning implied covenants of good faith and fair dealing. *See also Van Arnem*, 776 F.Supp. at 1223 (noting similarities between New York and Michigan law). Since no actual conflict therefore exists, the Court may apply New York law, the law of the forum in which it sits, when interpreting the Continuing Personal Guaranty. *See In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223–25, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993); *see also Elgin Sweeper Co. v. Melson Inc.*, 884 F.Supp. 641, 648 (N.D.N.Y.1995).

lation of the parties' presumed intentions or reasonable expectations," *M/A–COM Sec. Corp.*, 904 F.2d at 136, the Paladinos' claim for breach of good faith necessarily fails.

Summary judgment therefore will be granted in the defendants' favor on this claim.

## II. Chrysler's Counterclaims

 Chrysler also seeks summary judgment on its three counterclaims, which seek to enforce the terms of the Continuing Personal Guaranty, the Chrysler Forbearance Agreement, and the Chrysler Promissory Note. Chrysler Ans., Counterclaim ¶¶ 5–25. Chrysler claims that the Paladinos are jointly and severally liable in the amount of $605,759.24, plus interest, and seeks an award of costs and attorneys' fees.

The damages sought by Chrysler fall into two categories: debts incurred by Bronx Chrysler and debts incurred by WDI. Chrysler maintains that when Bronx Chrysler closed in October 1992, it was indebted to Chrysler in the amount of $352,934.98. (Chrysler 56.1 Stmt. ¶ 4.) The Paladinos recite and admit this indebtedness in the Chrysler Forbearance Agreement, which was executed on June 2, 1993. (Chrysler Forbearance Agreement at 1.) On that same date, the Paladinos executed and delivered to Chrysler a promissory note in the amount of $352,934.98, and thereby agreed to be personally liable for Bronx Chrysler's out-standing debt. According to Chrysler, the outstanding balance of this debt upon termination of the WDI Franchise Agreement was $313,034.98. (Chrysler 56.1 Stmt. ¶ 19.)

The debts incurred by WDI consist of the outstanding balance on the WDI Security/Capital Loan Agreement, which Chrysler claims to be $110,152.91, and the outstanding balance on the "dealer account" that WDI maintained with Chrysler pursuant to the WDI Franchise Agreement, which Chrysler claims to be $181,661.35. (Chrysler 56.1 Stmt. ¶¶ 16–17.) According to Chrysler, the Paladinos are personally liable for WDI's indebtedness as a result of the Continuing Personally Guaranty. (Chrysler 56.1 Stmt. ¶ 18.)

The Paladinos do not put up much of a fight on this issue, making no effort at all to dispute the total amount of the debts for which Chrysler contends they are liable.[13] Their principal contention is that they are not liable for these debts at all because the various agreements that Chrysler seeks to enforce against them were entered on false pretenses and under economic duress. According to Paladino, Chrysler reneged on its earlier promise to forgive Bronx Chrysler's indebtedness and enter into the WDI Franchise Agreement without condition, insisting instead that the Paladinos acknowledge personal liability for Bronx Chrysler's debts by signing the Chrysler Forbearance Agreement and Chrysler Promissory Note. (John Paladino Aff. ¶ 8; Pl. Resp. to Chrysler 56.1 Stmt. ¶¶ 12–13.)

---

**13.** Chrysler's own documentation in support of these amounts is somewhat limited. The outstanding balance on the Bronx Chrysler debt assumed by the Paladinos is reflected on a statement from Chrysler to WDI dated January 22, 1997. (Ferrera Aff. Ex. 19.) The outstanding balance on the WDI Security/Capital Loan Agreement is reflected in a schedule of liabilities filed by WDI with the bankruptcy court (and signed by Paladino) on February 4, 1997; that document, however, indicates that WDI owed Chrysler $110,007.76; Chrysler does not explain the discrepancy. (Ferrera Aff. Ex. 17 at DC00372.) The outstanding balance on WDI's "dealer account" is reflected in a Chrysler Dealer Statement for WDI for the month ending January 31, 1997. (Ferrera Aff. Ex. 18 at DC00002.) Nevertheless, since the Paladinos do not contest the amount, the Court will accept Chrysler's calculations as uncontradicted.

The existence of economic duress may be established "by proof that one party ... has threatened to breach [an] agreement by withholding performance unless the other party agrees to some further demand," such as additional contract terms. *805 Third Avenue Co. v. M.W. Realty Assocs.*, 58 N.Y.2d 447, 451, 461 N.Y.S.2d 778, 448 N.E.2d 445 (1983). In this case, however, the Paladinos provide no evidence that Chrysler ever agreed to forgive Bronx Chrysler's debts in the first place. The only evidence upon which Paladino relies is a statement, allegedly made in March 1993, by a Chrysler employee who said, "We're going to put you back in business, you owed us $250,000, whatever the balance was, and what I want you to do is make a lot of money and when you're making money, send me a check." (John Paladino Dep. at 105.) This statement, however, provides no support for the Paladinos' assertion that Chrysler agreed to forgive Bronx Chrysler's debts altogether – to the contrary, the statement is entirely consistent with the terms of the written agreements into which the parties ultimately entered.

Having failed to establish that Chrysler ever agreed to forgive Bronx Chrysler's debts, the Paladinos cannot claim duress on the basis of Chrysler's insistence that the Paladinos agree to assume those debts. With no evidence to support the Paladinos' defense of economic duress, summary judgment on Chrysler's counterclaim is therefore appropriate and will be granted.

## CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment are granted.

SO ORDERED.