United States Court of Appeals,

Eleventh Circuit.

No. 94-3372.

Gary J. PEARSON, Plaintiff-Counter-Defendant-Appellant,

v.

FORD MOTOR COMPANY, Ford Motor Credit Company, Ford Leasing Development Company, Ford Corporations from "A" through "Z", Beal Parkway Lincoln-Mercury Inc., Defendants-Appellees,

Ft. Walton Beach Lincoln-Mercury, Inc., Defendant-Counter-Claimant-Appellee.

Nov. 15, 1995.

Appeal from the United States District Court of the Northern District of Florida. (No. 93-30031-RV) Roger Vinson, Judge.

Before BIRCH and CARNES, Circuit Judges, and SIMONS[*], Senior District Judge.

PER CURIAM:

Plaintiff-appellant Gary J. Pearson brought this case alleging a cause of action under the Automobile Dealers' Day in Court Act, 15 U.S.C. Sections 1221-1225, as well as nine additional state law causes of action. The District Court subsequently granted defendants' joint Motion for Summary Judgment on the ADDCA claim and dismissed the state law claims without prejudice. *Pearson v. Ford Motor Company,* 865 F.Supp. 1504 (N.D.Fla.1994). We affirm the District Court on the fundamental ground that appellant lacks standing.

Defendant Ford Motor Company operates a Dealer Development Plan in which it assists individuals lacking sufficient investment

---

[*]Honorable Charles E. Simons, Jr., Senior U.S. District Judge for the District of South Carolina, sitting by designation.

capital to become owners of independent dealerships. Participants may become owners after successfully operating dealerships largely capitalized by Ford. The program was begun in the early 1950's and has more recently been used for the additional purpose of increasing opportunities for members of minorities to become owners of dealerships. Appellant Pearson, who is of African-American descent, was first employed by Ford in 1973. By 1975, Pearson had become a zone manager, and in 1983, he was zone manager of the territory which included Fort Walton Beach, Florida. Pearson was interested in an existing dealership there, the owner of which had determined to close or sell it.

Pearson did not have adequate funds to purchase the dealership, and consequently the sale was made through the Dealer Development Program. On July 12, 1983, Pearson signed a letter of understanding with Ford which provided that Ford would furnish startup capital of $320,000.00 for Fort Walton Beach Lincoln-Mercury ("FWBLM"). Pearson would provide $80,000.00, to be held in escrow for the first six months of operation, during which time Ford would make the entire initial investment. The agreement provided that if Pearson chose not to continue in the venture during the initial period, the escrow funds would be returned to him. If he chose to continue in the venture, the escrowed funds would be used to purchase common stock in FWBLM.

On July 18, 1983, Ford entered into distinct sales and service agreements with FWBLM. Pearson was not a party to these agreements, which identified FWBLM as the "dealer" and which gave FWBLM the right to acquire Ford vehicles and parts and to sell them

to the public.  The sales and service agreements imposed all obligations on FWBLM and not on Pearson, who was at this point only the dealership's hired General Manager.

At the conclusion of the initial six month period, Pearson chose to continue in the undertaking, and on February 1, 1984, he entered into a Dealer Development Agreement with Ford and a Management Agreement with FWBLM.  Pursuant to the Dealer Development Agreement, Ford received 1600 shares of convertible preferred stock in FWBLM, and Pearson received 800 shares of common stock.  The common stock had no voting rights as long as any preferred stock was outstanding.

The Dealer Development Agreement further provided that if the dealership were profitable, a portion of Pearson's share of the profits would be used to gradually purchase Ford's preferred stock in FWBLM and convert it into common stock.  Pearson could only purchase Ford stock from the profits of FWBLM, not with any other funds.  Under this plan, only if the dealership were profitable under his management, would Pearson eventually own it.  Ford had no obligation to provide any additional capitalization, but if it chose to do so, Ford would receive additional preferred stock in proportion to its contributions.

The Board of Directors of FWBLM was composed of Pearson and three other Directors chosen by Ford.  The Management Agreement provided that Pearson was to serve as President and Operator of FWBLM.  Pearson was the on-site Manager and was responsible for the day to day operations of the dealership.  Both the Dealer Development Agreement and the Management Agreement were terminable

at will by either party.  Both Agreements also stated that termination was likely if the dealership lost money to the point that Pearson's equity interest had no value.

The dealership was profitable from 1984 to 1986.  Because his portion of the profits were used to purchase stock, Pearson owned 79% of the total FWBLM stock by the end of 1986.  However, in 1987 and the first quarter of 1988, the dealership lost money and as a result of these losses, offset by Ford's further capital contributions of more than $1,000,000.00 during the last four years of operation, Pearson's ownership interest had declined to 34% of the total stock by the end of 1988.  By the end of 1989, Pearson's common stock had no value and this remained the case until he was terminated in February of 1991 by the FWBLM Board of Directors.

Against this factual background, we project the following statutory definition of "automobile dealer", as set out in 15 U.S.C. Section 1221(c):

> The term "automobile dealer" shall mean any person, partnership, corporation, association, or other form of business enterprise resident in the United States or in any territory thereof or in the District of Columbia operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons.

The District Court concluded that FWBLM, and not appellant Pearson, was the "automobile dealer" under the statutory definition.  We agree.[1]

Pearson was himself never a party to FWBLM's Franchise Agreements with Ford.  These Agreements were entirely between Ford

---

[1]The District Court chose not to follow the conclusion reached in *Kavanaugh v. Ford Motor Co.,* 353 F.2d 710 (7th Cir.1965).  We agree that, on these facts, the better view is the one reflected herein.

and FWBLM.  In support of his position, Pearson cites *York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp.,* 447 F.2d 786 (5th Cir.1971), but we find that case to be distinguishable.  That decision relied heavily upon the fact that the Yorks, although not signers of the franchise agreement, were "inextricably woven into it."  In essence, the court concluded that Chrysler had made the Yorks essential to the operation of the dealership.

This was manifestly not the case with Pearson, who was in fact ultimately terminated and replaced.  Thus, there is no basis for applying the rationale of *York,* which itself recognized that "individuals would not come within the scope of the Act merely because they were the sole stockholders, officers and directors of the corporate franchise holder."  447 F.2d at 790.

Because of our finding with respect to Pearson's lack of standing, it is not necessary to consider the alternative bases for the District Court's opinion.

AFFIRMED.