JACK DAVIDSON & another[1] *vs*. GENERAL MOTORS CORPORATION.

No. 01-P-316.

Suffolk. November 15, 2002. - March 25, 2003.

Present: LAURENCE, KAPLAN, & DOERFER, JJ.

*Fiduciary. Consumer Protection Act,* Unfair or deceptive act. *Corporation,* Close corporation. *Motor Vehicle,* Sale, Dealer. *Contract,* Performance and breach.

In an action arising from the acquisition and financing of an automobile dealership in which the plaintiff-purchasers of the dealership had explicitly acknowledged that they understood that the defendant might have information about the agreement that it would not share with the plaintiffs and that the plaintiffs would be responsible for investigating the facts for themselves, the plaintiffs could not, on the basis of the summary judgment materials presented, establish at trial that there was a fiduciary relationship between the parties no matter how clear it was that the plaintiffs decided to rely on the information provided by the defendant or that the defendant was aware of that decision by the plaintiffs [642-644]; nor, given the explicit undertaking of the plaintiffs to conduct their own due diligence, could it be said that the conduct of the defendant supported an inference that it was unfair or deceptive under G. L. c. 93A, § 11 [644].

In an action arising from the acquisition and financing of an automobile dealership in which the plaintiff-purchasers claimed that once the new closely held Delaware corporation was established, the defendant-shareholder had a fiduciary duty toward them, summary judgment was properly entered for the defendant, where there was no heightened fiduciary duty on a shareholder in a close corporation governed by Delaware law. [644-645]

In an action arising from the acquisition and financing of an automobile dealership in which the plaintiff-purchasers were directors and officers of the corporation formed, which was the motor vehicle dealer and which was making the sales of automobiles to the public, the judge, on the defendant's motion for summary judgment, correctly concluded that the plaintiffs, as individuals, did not have standing to assert claims under G. L. c. 93B. [645-646]

In an action arising from the acquisition and financing of an automobile dealership in which the plaintiff-purchasers claimed that the defendant was in breach of the agreement pursuant to which the new venture was formed,

[1] Mark Davidson.

that there was a covenant of good faith and fair dealing as part of the agreement implied in law, and that the defendant was in breach of that covenant, the judge properly allowed the defendant's motion for summary judgment on this claim where, even if an implication of heightened fiduciary duties were to survive the rigors of controlling Michigan and Delaware law, limiting the extent of the asserted duty, the facts supplied in the summary judgment record, setting aside their conclusory nature, did not support an inference that the defendant failed to act with good faith and deal fairly with the plaintiffs. [646-647]

CIVIL ACTION commenced in the Superior Court Department on August 31, 1994.

A motion to dismiss a claim for breach of contract was heard by *Margaret R. Hinkle,* J., and motions for summary judgment on other claims were heard by *Regina L. Quinlan,* J.

*Vincent L. DiCianni* (*Carlene A. Pennell* with him) for the plaintiffs.

*Daniel L. Goldberg* (*Lawrence S. Buonomo,* of Michigan, with him) for the defendant.

DOERFER, J. The plaintiffs, who are entrepreneurs in the automobile dealership business, brought this action against General Motors Corporation and several others[2] asserting claims arising out of their acquisition and financing of a dealership in Lynn. The plaintiffs eventually lost their investment in the dealership. The plaintiffs' complaint made numerous claims, of which four survive and are involved in this appeal: (1) a count for breach of contract (which was dismissed for failure to state a claim under Mass.R.Civ.P 12[b][6], 365 Mass. 755 [1974]); and counts for (2) breach of fiduciary duty, (3) breach of G. L. c. 93B, and (4) breach of G. L. c. 93A, all of which were dismissed on the allowance of the defendants' motions for summary judgment.

"Viewing the facts alleged in the summary judgment materials in the plaintiff's favor, as we must at this stage, we take the facts to be as next stated." *Piderit* v. *Siegal & Sons Investments,*

---

[2]As the case reaches us on appeal, the only remaining claims are against General Motors Corporation.

*Ltd.*, 55 Mass. App. Ct. 1, 2 (2002).[3] However, "[c]onclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment." *Madsen* v. *Erwin*, 395 Mass. 715, 721 (1985), quoting from *Olympic Junior, Inc.* v. *David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972).

The plaintiff Jack Davidson (Jack) had been investing in and managing automobile dealerships since the early 1960's. The plaintiff Mark Davidson (Mark), the nephew of Jack, was also experienced in the automobile business, principally in managing the used car departments of several dealerships. General Motors Corporation (GM) operates a dealer development program that invests in GM dealerships with individual investors through its Motors Holding Division (GM/MHD).

In 1990 the plaintiffs were interested in investing in Goff Chevrolet (Goff), a dealership in Candia, New Hampshire, which was in bankruptcy. They made an offer to purchase it, signed an agreement and made a $10,000 down payment. They approached GM/MHD for assistance in financing the acquisition of Goff, although GM/MHD was not a party to the deal when the deposit was made or thereafter. Patrick Browne, an assistant branch manager for GM/MHD, acted for GM/MHD in its dealings with the plaintiffs, and invited them to submit an application for GM/MHD to become a co-investor with them.

Prior to being contacted by the plaintiffs, Browne had been working for GM/MHD on a deal to purchase the assets of a dealership (Sea Crest) on the Lynnway in Lynn, which were available because of the imminent retirement of its owners, the Carpi brothers (Carpis). GM was interested in maintaining a Pontiac franchise in this location. There was competition in the real estate market for use of the Sea Crest site as a supermarket. Before lining up any investors for the dealership, Browne had negotiated the terms of the purchase and sale with the Carpis. When Browne was contacted by the plaintiffs, he learned that they had money to invest and that they had extensive experience in the automobile dealership business. He concluded they

[3]The parties agreed at oral argument that the breach of contract claim can be evaluated on the basis of the summary judgment materials even though it was disposed of on a motion to dismiss for failure to state a claim.

would be good candidates and persuaded them to invest their money in the Sea Crest acquisition and to become employed in the new venture to operate the GM franchises at the Sea Crest location.

The acquisition of the Sea Crest assets was ultimately accomplished by the creation of a Delaware corporation funded by both the plaintiffs and GM/MHD, in return for the issuance of stock in the new entity. A shareholders agreement (agreement) governed the relations between the two groups of investors (plaintiffs and GM/MHD) thereafter. When the new business did not perform to the degree specified in the agreement, GM/MHD exercised its rights under the agreement to purchase the plaintiffs' stock and the plaintiffs were removed as officers. Further facts will be set forth in the context of discussing the issues raised in this appeal.

A. *Claims relating to the formation of the agreement.* There is no dispute that Browne brought the Sea Crest acquisition to the attention of the plaintiffs and that Browne (on behalf of GM/MHD) was the party with whom the Carpis negotiated for the purchase and sale of their business. Browne told Jack that the Sea Crest deal was a "great deal" for them (the plaintiffs) and for GM and a better investment for the plaintiffs than was the Goff deal. He told Jack that the Carpis had a history of making $2 million in profits before taxes, and that the Carpis were making $50,000 per month even as absentee owners. He also told the plaintiffs that the Lynnway was one of the greatest auto streets in the country and that other dealers on the Lynnway were doing extremely well.

As to his negotiations with the Carpis, Browne told the plaintiffs that he had negotiated the so-called "Blue Sky" (good will) down to $500,000 from what the Carpis had been asking, and that he had negotiated hard to get a lease from the Carpis' real estate entity for $50,000 per month. He said all the plaintiffs had to do was invest $700,000 and GM/MHD would foot the rest. He also represented that the real estate taxes were $72,000 per year (in fact were $126,000 per year).

Browne had relied on incomplete information and inadequate documentation in his investigation of the transaction and did not determine or represent to the plaintiffs the true financial

condition of the Sea Crest business. He relied on unaudited and incomplete financial statements. These statements showed significant profits each year, but did not reflect appropriate end of the year accounting adjustments for certain expenses or taxes, which would have given a more accurate picture of profitability of the business. These adjustments were contained in so-called "13th statements" which Browne (but not, so they say, the plaintiffs) knew were common in the automobile dealership business, but which Browne had failed to ask for. Inaccurate financial information led to inaccurate profit projections.

Browne provided the plaintiffs with a rosy but inaccurate picture of the local economy and demographics of the area, the success of other dealers in the area, and the volume of traffic on the Lynnway.

On August 1, 1990, Jack and Mark each signed identical letters of understanding about the proposed deal in order to, in their terms, "clarify the status of our discussions." The letters stated,

> "Before investing in the Dealer Company, you must independently investigate and evaluate to your own satisfaction the merits and risks of doing so. Based upon its contractual relationships with other General Motors dealers and its future plans, Motors Holding may have information relating to the Dealer Company's prospective business, operations or financial condition. Whether or not Motors Holding shares this information with you, Motors Holding may use this information in determining whether to invest in the Dealer Company."

Jack and Mark signed their letters under a paragraph (after the signature of Browne on behalf of GM/MHD) which stated that they had read, understood and agreed with the statements in the letters and that they had had an opportunity to review the letters and the attachments with an attorney of their own choosing.

Nevertheless, the plaintiffs claim that GM/MHD breached a fiduciary duty to them by providing them with misleading, incomplete, and inaccurate information upon which they relied in making their decision to invest in the acquisition of the Sea Crest dealership. They also claim that such acts constituted

unfair and deceptive practices in violation of G. L. c. 93A, § 11.

In support of those claims the plaintiffs point out the fact that Browne told them that he was sworn to secrecy about the deal because the Carpis did not want anyone to know about it, and that the Carpis were concerned about losing valuable employees if word of the deal leaked out. The plaintiffs were not to speak to anyone about the deal. This, the plaintiffs claim, restricted their ability to do a meaningful investigation of the Sea Crest dealership. As a result, the plaintiffs made only one visit to the site of the dealership, on a Sunday morning when the dealership was closed. Browne told them not to call the Sea Crest dealership or other dealerships to inquire about Sea Crest's performance.

1. *Breach of fiduciary duty.* The plaintiffs claim that GM/MHD had a fiduciary duty to them which was breached. They cite *Stark* v. *Advanced Magnetics, Inc.,* 50 Mass. App. Ct. 226, 233-234 (2000), where we stated, in the context of the tolling of the statute of limitations, that if a defendant has a fiduciary duty to disclose facts and fails fully to do so, the fact that a plaintiff had the means of learning the relevant facts for himself would not preclude the tolling of a statute of limitations until such time as the plaintiff acquired actual knowledge of the facts. See *Demoulas* v. *Demoulas Super Mkts., Inc.,* 424 Mass. 501, 519-520 (1997).

The relevant inquiry here, as in *Stark,* is whether the parties' relationship was a fiduciary one or amounted to no more than an arm's length business relationship. See *Broomfield* v. *Kosow,* 349 Mass. 749, 755-757 (1965); *Markell* v. *Sidney B. Pfeifer Foundation, Inc.,* 9 Mass. App. Ct. 412, 443-444 (1980). To establish that GM/MHD owed the plaintiffs the duties of a fiduciary, the plaintiffs must show at least that the relationship was one of trust and confidence; that the plaintiffs relied upon the specialized knowledge or judgment of GM/MHD; and that GM/MHD was aware of the plaintiffs' reliance upon it. *Ibid.*

Assuming, as we must, such reliance and awareness of it by GM, the plaintiffs' claim receives a death wound from the summary judgment record: it is undisputed that the plaintiffs knew that GM/MHD was acting to protect and advance its own

interests and that the plaintiffs agreed to be responsible for conducting their own due diligence. In the August 1, 1990, letters of understanding the plaintiffs explicitly acknowledged that they understood that GM/MHD might have information about the deal that it would not share with the plaintiffs and that the plaintiffs were responsible for investigating the facts for themselves. Thus, the plaintiffs cannot establish at trial that there was a fiduciary relationship between the parties no matter how clear it is that the plaintiffs decided to rely on the information provided by GM/MHD or that GM/MHD was aware of that decision by the plaintiffs.

A business relationship is not transformed into a fiduciary relationship merely because trust was reposed by one party in the other party. *Patsos* v. *First Albany Corp.*, 433 Mass. 323, 335-336 (2001), citing *Snow* v. *Merchants Natl. Bank*, 309 Mass. 354, 360-361 (1941), and *Broomfield* v. *Kosow*, 349 Mass. at 755. Although a catalyst in the transformation of a business relationship into a fiduciary relationship may be the defendant's knowledge of the plaintiff's reliance on him, *Broomfield* v. *Kosow*, 349 Mass. at 755, that transforming reaction is inhibited (to continue the chemical analogy) when, as here, the parties expressly agreed that the plaintiffs would have the obligation to check things for themselves. In terms of the analysis in *Patsos, supra*, the relationship here was like that between a customer and a broker in a nondiscretionary account: the plaintiffs here were told by GM/MHD to investigate the investment for themselves and not to rely on GM/MHD.

The plaintiffs' reliance on Browne's entreaty not to bother to investigate and to defer to the wishes of the Carpis is not sufficient, in light of their written contemporaneous acknowledgment that they would investigate. The plaintiffs had a choice: to honor that request and run for luck or to insist on their need to investigate the facts for themselves or to withdraw from further pursuit of the deal. In a business context when sophisticated parties have reduced their understandings to writing, they cannot be heard to allege that they didn't really mean what they said or that they didn't understand what they were doing. See, e.g., *Carr* v. *CIGNA Sec.*, 95 F.3d 544, 547-548 (7th Cir. 1996) (literate competent adults cannot rely on verbal statements from

other side of business deal that contradict plain and binding writing). Compare *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 713 (1990).

It also may be taken as true, as argued by the plaintiffs, that they trusted GM/MHD based on their previous successful history with GM/MHD; that GM/MHD had a good reputation in making such investments; that they accepted Browne's representations because of his position with GM/MHD; and that they decided to go forward based on financial numbers provided by Browne in which his calculations seemed reasonable.[4] It can also be taken as true that, when the plaintiffs requested other documents, Browne told them they didn't need a lot of documents because they were getting such a great deal.

The plaintiffs believed Browne had negotiated a great deal based on Browne's representations and forecasts and documents provided to them by Browne. But the plaintiffs' choice to trust the information and assessment of Browne and GM/MHD about the deal did not undermine the clear basis of the negotiations, that the plaintiffs were responsible for checking things for themselves.

2. *Violation of G. L. c. 93A.* The considerations recited above also dispose of the plaintiffs' claim under G. L. c. 93A, § 11.[5] There is no reasonable interpretation of the conduct of GM/MHD, given the explicit undertaking of the plaintiffs to conduct their own due diligence, that would support an inference that it was unfair or deceptive. *Schwanbeck* v. *Federal-Mogul Corp.*, 31 Mass. App. Ct. 390, 414 (1991), *S.C.*, 412 Mass. 703 (1992) ("Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact . . ., the boundaries of what may qualify for consideration as a [G. L. c.] 93A violation is a question of law.") See *R.W. Granger & Sons, Inc.* v. *J & S Insulation, Inc.*, 435 Mass. 66, 73 (2001).

B. *Claims relating to the performance of the agreement.* The remaining claims of the plaintiffs relate to events following the

---

[4]They cannot, however, rely on conclusory allegations that Browne was partial to the Carpis.

[5]There is no need to analyze other arguments of the parties on this issue, e.g., whether GM/MHD was a mere joint venturer. See, e.g., *Szalla* v. *Locke*, 421 Mass. 448, 451-452 (1995).

acquisition of the Sea Crest assets. Pursuant to the agreement, GM/MHD was issued preferred stock and was entitled to select a majority of the members of the board of directors. The plaintiffs were elected officers of the new company and, as such, were in general charge of the day-to-day operations of the corporation.

The business did not flourish as hoped and expected. In the first year the profits were minimal. Thereafter, the business declined. The plaintiffs attribute the decline to the fact that the GM/MHD directors, through Browne and his successor, one Chamberlain, asserted increasingly adverse influence and interference over operations, as well as the fact that the strength of the business was not as initially represented by GM/MHD.[6] Jack wanted to reduce the rent and infuse capital, and GM would not go along.

In the fall of 1993 GM directors discharged the plaintiffs. A new lease was eventually negotiated with the Carpis on the same terms that the plaintiffs had sought. GM/MHD made a cash infusion as previously requested by Jack but denied to him.

1. *Breach of fiduciary duty.* The plaintiffs claim that once the new closely held corporation was established, GM/MHD had a fiduciary duty toward them. The motion judge agreed. Since the motion judge's decision, the Supreme Judicial Court has held that there is not "a heightened fiduciary duty on shareholders in a close corporation" governed by Delaware law. *Harrison* v. *NetCentric Corp.,* 433 Mass. 465, 472 (2001). Summary judgment was properly entered on this claim, although on a basis different from that of the motion judge.

2. *Claims under G. L. c. 93B.* The protection of G. L. c. 93B[7] extends to a "motor vehicle dealer," which is defined as

---

[6]There were disputes over the lack of cash; the need for assistance in negotiating a new lease with the Carpis; and the need for a new showroom for a newly acquired Chevrolet franchise.

[7]Section 3 states, "Unfair methods of competition and unfair or deceptive acts or practices, as defined in section four, are hereby declared to be unlawful." Section 4 broadly and specifically prohibits "any manufacturer, factory branch, factory representative, distributor or wholesaler, distributor branch, distributor representative or motor vehicle dealer to engage in any ac-

> "any person who, in the ordinary course of business, is engaged in the business of selling new or used motor vehicles to consumers or other end users. . . ."

G. L. c. 93B, § 1(*h*). The definition specifically excludes receivers, trustees, administrators, executors, and the like. *Ibid.* "Sale" is defined in § 1(*l*) as

> "the issuance, transfer, agreement for transfer, exchange, pledge, hypothecation, mortgage in any form, whether by transfer in trust or otherwise, of any motor vehicle or interest therein . . . ."

The plaintiffs were directors and officers of the corporation which was the motor vehicle dealer and which was making the sales of automobiles to the public. Only in the most colloquial sense were they, as individuals, the sellers of the product. The motion judge was correct in ruling that they, as individuals, did not have standing to assert claims under the statute. See, e.g., *Pearson* v. *Ford Motor Co.*, 68 F.3d 1301, 1303 (11th Cir. 1995) (interpreting similar language in Federal Automobile Dealers Day in Court Act, 15 U.S.C. § 1221, holding that minority stockholder of dealer company in which Ford was majority stockholder did not qualify as "automobile dealer" for purposes of standing to sue under statute).

3. *Claims for breach of covenant of good faith and fair dealing.* The plaintiffs' complaint contained a count for breach of contract. The only "contract" ultimately referred to in the pleadings was the agreement pursuant to which the new venture was formed. The plaintiffs claim that there was a covenant of good faith and fair dealing as a part of the agreement implied in law and that GM/MHD was in breach of that covenant. Passing both the pleading point and that this argument was not made in opposition to the motion to dismiss,[8] we turn to the "contract" nature of the implied covenant.

We have recently expressed our preference for the terminology of the Restatement (Second) of Contracts § 205 (1979):

---

tion which is arbitrary, in bad faith, or unconscionable and which causes damage to any of said parties or to the public."

[8]The matter is being considered here, by agreement, on a summary judgment basis, not on a pleading basis. See note 3, *supra.*

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Tufankjian* v. *Rockland Trust Co.*, *ante* 173, 174 n.1 (2003). The extent of that duty is limited, however, by other law relevant in the context of this case. The agreement recited that it was governed by Michigan law. Under Michigan law, an obligation of good faith does not override express contract terms. See *General Aviation, Inc.* v. *Cessna Aircraft Co.*, 915 F.2d 1038, 1041 (6th Cir. 1990). The agreement gave GM/MHD a majority voting control, representation on the board, and an unconditional right to terminate the plaintiffs' stock ownership when net losses exceeded a certain amount.

Although under Delaware law the stockholders of a closely held corporation can expressly provide for duties not otherwise implied for a Delaware corporation, see *Harrison* v. *NetCentric Corp.*, 433 Mass. at 469, the agreement does not expressly so provide in this case. Nor is it permissible to imply such a "term" or "covenant" or obligation and thereby negate the clear limitations on such implied obligations imposed by Delaware law. *Ibid.*

Even if an implication of heightened fiduciary duties were to survive the rigors of Michigan and Delaware law, the facts supplied in the summary judgment record do not, when washed of their conclusory nature, support an inference that GM/MHD failed to act with good faith and deal fairly with the plaintiffs.[9] The structure created by the parties to govern their relationship in this new enterprise clearly provided for control by GM/MHD. The dispute between the parties revealed by the summary judgment record (see note 6, *supra*) was no more than a difference of business judgment and a decision by GM, within the authority and parameters granted by the agreement, that the business would do better without the plaintiffs.

*Judgment affirmed.*

---

[9]This is not a situation, such as pertained in *The Cadle Co.* v. *Vargas*, 55 Mass. App. Ct. 361, 365-366 (2002), where situations arose which were unforeseen when the relationship started.