# United States Court of Appeals
## For the First Circuit

No. 04-1450

THE CADILLAC/OLDSMOBILE/NISSAN CENTER, INC., DOING BUSINESS AS
JOHN SANTILLI'S CENTER FOR AUTOMOBILES,

Plaintiff, Appellant,

v.

GENERAL MOTORS CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Selya, Circuit Judge,

Campbell and Leval,* Senior Circuit Judges.

Richard N. Sox, Jr., with whom Daniel E. Myers, Benjamin B.
Bush, Myers & Fuller, P.A., Michael P. Connolly, and Murtha,
Cullina were on brief, for appellant.
James C. McGrath, with whom Daniel L. Goldberg, Serena D.
Madar, Bingham McCutchen LLP, and Lawrence S. Buonomo were on
brief, for appellee.

December 8, 2004

_____
*Of the Second Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.  Like most states, Massachusetts regulates the relationship between motor vehicle manufacturers and motor vehicle dealers in considerable detail.  See Mass. Gen. Laws ch. 93B, §§ 1-15.[1]  Relying on these rules, a multi-brand dealer doing business as John Santilli's Center for Automobiles (Santilli) brought suit against a manufacturer, General Motors Corporation (GM), alleging that the manufacturer had engaged in a number of unfair practices.  GM denied the material allegations of the complaint.  Without resolving whether the manufacturer had violated the statute, the district court entered summary judgment in its favor on the ground that Santilli had not shown any actionable harm flowing from the challenged conduct.  Discerning no error in the district court's thoughtful disposition, we affirm.

## I.  THE STATUTORY SCHEME

We begin by limning the purpose, text, and structure of the statute.  Chapter 93B, familiarly known as the "Dealers' Bill of Rights," has two central purposes.  One is to curb "the potentially oppressive power of automobile manufacturers and distributors in relation to their affiliated dealers."  Beard Motors, Inc. v. Toyota Motor Distribs., Inc., 480 N.E.2d 303, 306 (Mass. 1985).  The other is to regulate competition in the retail

---

[1]The legislature amended chapter 93B in 2002.  See 2002 Mass. Legis. Serv. ch. 222 (West).  The relevant events in this case occurred before the effective date of the amendment, so the pre-amendment version of the statute controls.  Throughout this opinion, we cite to that version.

automobile industry for the benefit of the public at large. Am. Honda Motor Co. v. Bernardi's, Inc., 735 N.E.2d 348, 354 (Mass. 2000).

To effectuate these dual objectives, the statute places off limits certain "[u]nfair methods of competition and unfair or deceptive acts or practices." Mass. Gen. Laws ch. 93B, § 3. These methods, acts, and practices are delineated in section 4. That section generally proscribes conduct that is "arbitrary, in bad faith, or unconscionable." Id. § 4(1). It then describes, and specifically prohibits, twenty-one discrete acts and practices. Id. § 4(2)-(4).

The statutory scheme maps two remedial avenues. One involves public enforcement: the Attorney General may enforce the law. Id. § 12. The other involves private enforcement: the statute creates private rights of action for injunctive relief and damages. Id. § 12A.

This case turns on the meaning and operation of section 12A. In pertinent part, that section authorizes "[a]ny franchisee or motor vehicle dealer who suffers any loss of money or property . . . as a result of [a violation of the statute by a manufacturer]" to bring a civil action for equitable relief or damages. A dealer who has not suffered a loss of money or property as a result of an unfair act or practice may still bring an action for equitable relief — but not for damages — if "it can be shown

that the . . . unfair act or practice may have the effect of causing such [a] loss of money or property" in the future.  Id.

## II.  THE FACTS

Consistent with the summary judgment standard, we rehearse the facts in the light most favorable to Santilli.  See Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).

For many years, Santilli has operated an independent automobile dealership in Brockton, Massachusetts.  It is, inter alia, licensed to sell the Cadillac line of vehicles (Cadillac is a GM brand and all licensed Cadillac dealers are, therefore, GM franchisees).  During the same time frame, Norwood Cadillac has operated a Cadillac dealership in Norwood, Massachusetts.  By 1998, the two dealerships had been in competition for several years.  For purposes of this appeal, we assume — but do not decide — that Norwood Cadillac is within Santilli's relevant market area (RMA), as that term is defined in Mass. Gen. Laws ch. 93B, § 4(3)(k).[2]

In the late 1990s, GM inaugurated the multi-site project (MSP), a program designed to increase GM's presence in certain geographic markets.  Under the aegis of the MSP, GM aspired to

---

[2]GM argues that Santilli failed to produce competent evidence that Norwood is in Santilli's RMA and urges us to affirm the entry of summary judgment on this alternative ground.  See, e.g., Houlton Citizens' Coalition, 175 F.3d at 184 (explaining that the court of appeals may affirm an order for summary judgment "on any ground revealed by the record").  Given the view that we take of the case, see text infra, we need not resolve this issue.

create joint ventures with successful independent dealers so that the latter could own multiple dealerships (thus achieving economies of scale and, not coincidentally, improving sales of GM vehicles in the targeted markets).

In November of 1998, the MSP came to the greater Boston area when a wholly-owned subsidiary of GM partnered with Joseph Laham, the owner of Norwood Cadillac, to form Mass Bay Automotive, LLC (MassBay). The original plan contemplated that MassBay, under Laham's hegemony, would own and operate both Norwood Cadillac and North Shore Buick-Pontiac-GMC Truck (a dealership that GM previously had acquired). GM contributed approximately $13,000,000 in working capital and the assets of the North Shore dealership to MassBay in exchange for a 90% ownership interest. Laham contributed the fixed assets and leasehold improvements of Norwood Cadillac, valued in excess of $1,400,000, in exchange for a 10% ownership interest. He then sold the Norwood dealership, including its goodwill and inventories of used cars and parts, to MassBay for approximately $6,300,000.

MassBay proved to be a flop, and Laham sold his ownership interest to GM in January of 2000. At that point, GM was, in effect, the sole owner of Norwood Cadillac. It then began seeking a purchaser for the dealership, hoping to find a buyer who would operate Norwood as part of another MSP arrangement. When this gambit failed, GM began pursuing a more traditional sale. To this

-5-

end, it solicited bids for the dealership in mid-2001. Santilli was among the bidders, but GM accepted a better offer from a third party. The sale closed, and GM's de facto ownership of Norwood Cadillac ceased, on October 30, 2001.

## III.  THE LAWSUIT

Invoking diversity jurisdiction, 28 U.S.C. § 1332(a), Santilli sued GM in the United States District Court for the District of Massachusetts. Its complaint contained four statements of claim. We describe them briefly.

Count 1 emanates from a provision of the Dealers' Bill of Rights that renders it unlawful for an automobile manufacturer

> to own and operate . . . a motor vehicle
> dealership within the relevant market area of
> a motor vehicle dealer of the same line make;
> provided, however, that a manufacturer . . .
> shall not be deemed to be in violation of this
> paragraph when operating a dealership either
> temporarily for a reasonable period in any
> case not to exceed one year or in a bona fide
> relationship [with] an independent person . .
> . .

Mass. Gen. Laws ch. 93B, § 4(3)(k). Santilli alleges that GM violated this prohibition from and after November of 1999 (one year after MassBay had assumed ownership of Norwood Cadillac). In its view, Laham's relatively small equity interest in MassBay, combined with the restrictive provisions of the MassBay operating agreement, precluded MassBay from coming within the statutory safe harbor for "bona fide relationship[s]" between manufacturers and independent persons. See id. As a fallback, Santilli alleges that GM violated

-6-

the statutory prohibition from and after January of 2001 (one year after it had assumed full ownership of MassBay and, by extension, of Norwood Cadillac).

Santilli premised count 2 on the catchall provision of the Dealers' Bill of Rights. That provision proscribes actions that are "arbitrary, in bad faith, or unconscionable." Id. § 4(1). In support of this claim, Santilli alleged that GM's ownership and operation of Norwood Cadillac after the one-year statutory grace period and its favorable treatment of Norwood Cadillac during the ensuing period[3] constituted arbitrary and unconscionable conduct.

Count 3 alleges that GM acted arbitrarily in its allocation of new vehicles, thus unfairly benefitting Norwood Cadillac. Inasmuch as Santilli quickly abandoned this claim, we eschew any further comment on it.

Count 4 alleges that GM violated a statutory provision that generally prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices." Id. 3(a). This count essentially replicates the substantive claims set out in the previous three counts.

At the close of discovery, Santilli moved for partial summary judgment on the three counts then remaining, namely, counts

---

[3]Santilli alleged, for example, that GM allowed Norwood Cadillac and North Shore to share administrative personnel (a practice that GM normally forbids) and that Norwood Cadillac received financing rates from General Motors Acceptance Corporation that were unavailable to independent dealers.

1, 2, and 4. GM cross-moved for summary judgment. It advanced two grounds: (i) that Santilli had failed to introduce competent evidence that Norwood Cadillac is in Santilli's RMA, see supra note 2; and (ii) that even if GM had violated the statute, Santilli nonetheless had failed to adduce any evidence that the violation(s) had caused it a loss of money or property as required by section 12A as a precondition of a suit for damages.

Santilli's proof concentrated heavily on GM's overlong ownership and operation of Norwood Cadillac. In an effort to satisfy the injury requirement with respect to that violation, Santilli proffered expert evidence estimating the additional sales that it would have garnered but for the continued presence of the Norwood dealership during the wrongful interval. Santilli argued that the statute forbade GM from owning and operating Norwood Cadillac during that interval and, therefore, that GM should have closed the doors once the one-year statutory grace period had expired. Based on this premise, Santilli claimed that it was entitled to damages equivalent to the profits it would have realized through increased sales had Norwood Cadillac ceased operations.

The district court rejected this theory of damages and granted GM's summary judgment motion on the ground that Santilli had failed to demonstrate that it had sustained any loss of money or property as a result of this putative violation. Citing section

12A of chapter 93B, the court reasoned that a plaintiff must show that the violation itself caused the plaintiff harm. Applying that principle, the proper measure of damages under section 4(3)(k) is the increase in profits that the aggrieved dealer would have realized had it been competing, during the wrongful interval, against an independently owned dealership instead of a manufacturer-owned dealership. Since Santilli failed to introduce any evidence that would support a finding of injury on this basis, the court rebuffed count 1 of its complaint.

The court simultaneously granted summary judgment in GM's favor on counts 2 and 4. As to each of those counts, the court noted that Santilli's proof sufficed only to show overlong ownership. It concluded that Santilli could not recover in a chapter 93B suit under a generic proscription when a more specific provision, in this case section 4(3)(k), applies directly to the challenged conduct. This timely appeal followed.

## IV. ANALYSIS

Our review of an order granting summary judgment is plenary. Houlton Citizens' Coalition, 175 F.3d at 184. The primary question presented in this appeal is whether the district court correctly apprehended the measure of damages under section 4(3)(k). To frame that question, we assume, for argument's sake, that GM was in violation of section 4(3)(k), at least from January

3, 2001 forward (i.e., one year after it acquired full ownership of Norwood Cadillac).

In our view, the language of section 12A makes pellucid that a plaintiff seeking damages under chapter 93B must show more than that a defendant violated some substantive provision of the statute. Rather, the plaintiff must show both that a violation occurred and that the violation harmed the plaintiff. Martha's Vineyard Auto Vill., Inc. v. Newman, 569 N.E.2d 401, 405 (Mass. App. Ct. 1991). A necessary corollary of this injury requirement is that a non-injurious violation may occur and, if that is the case, the plaintiff will not be able to recover damages. See Coady Corp. v. Toyota Motor Distribs., Inc., 361 F.3d 50, 59 (1st Cir. 2004) (upholding the district court's denial of relief under chapter 93B when the evidence may have established a statutory breach but the plaintiff failed to demonstrate any injury flowing therefrom).

This brings us to the task of defining the injury needed to justify recovery of damages under section 4(3)(k). We must make this determination with reference to the purposes of the statute. See Am. Honda, 735 N.E.2d at 354 (interpreting chapter 93B with reference to statutory purpose). The main object of section 4(3)(k) is to forfend against unfair competition, that is, to protect independent dealers from having to compete on unequal terms with dealerships owned and operated by manufacturers. The statute

-10-

does not attempt to safeguard dealers from competition with other dealers on a level playing field. See id. (noting that chapter 93B strives to strike a balance by controlling unfair trade practices without "shielding dealers from all competition"). Accordingly, a section 4(3)(k) plaintiff must show that it has suffered harm by being forced into unfair competition with a manufacturer-owned dealership.

Santilli's evidence, taken in the light most favorable to it, establishes only that the continued existence of Norwood Cadillac hampered its sales. However, Santilli presented no evidence that GM's unlawful ownership and operation of Norwood Cadillac made Norwood a more formidable competitor, thereby causing Santilli to lose sales or profits. This is a fatal deficiency because section 4(3)(k) did not require GM to close Norwood Cadillac at the expiration of the one-year statutory grace period. GM had other lawful alternatives to a complete shut-down of Norwood Cadillac, most notably, selling the dealership to an independent operator.

Placed in perspective, Santilli's proposed measure of damages does not flow from GM's violation of the statute, but from GM's failure to take one possible route to statutory compliance. In effect, then, Santilli urges us to hold that it is entitled to damages because it was denied a windfall that it would have enjoyed had GM shuttered the Norwood dealership while seeking a buyer. The

only thing illegal about the existence of the Norwood dealership was that it was owned and operated by GM. If Santilli cannot show that he suffered any loss of money or property as a result of that illegal ownership and operation, it is not authorized by section 12A to bring suit for damages. Santilli's approach ignores the injury requirement limned in section 12A and, in the bargain, converts section 4(3)(k), by judicial fiat, into a strict liability statute. Nor is this unfortunate result accompanied by any corresponding gain; Santilli's approach would not further the statute's purpose and, indeed, would run counter to the statutory goal of benefitting consumers.

Santilli loudly protests that we will eviscerate section 4(3)(k) if we require plaintiffs to demonstrate that they have suffered special injury from compelled competition with manufacturer-owned dealerships. Santilli complains that, as a practical matter, it will be impossible to prove that such a disadvantage caused harm and, therefore, that the statutory remedy — an action for damages — will prove to be fool's gold. This animadversion is misplaced for two reasons.

First, we see nothing insurmountable (or even particularly difficult) in the requirement that a section 4(3)(k) plaintiff show injury flowing from a manufacturer's unlawful ownership and operation of a competing dealership. The Massachusetts cases are clear that damages under unfair competition

-12-

statutes need not be proved with mathematical certainty. See, e.g., Datacomm Interface, Inc. v. Computerworld, Inc., 489 N.E.2d 185, 196 (Mass. 1986); Nat'l Merch. Corp. v. Leyden, 348 N.E.2d 771, 774 (Mass. 1976); Ricky Smith Pontiac, Inc. v. Subaru of New Engl., Inc., 440 N.E.2d 29, 48 (Mass. App. Ct. 1982); cf. Veranda Beach Club Ltd. P'ship v. W. Sur. Co., 936 F.2d 1364, 1385 (1st Cir. 1991) (noting that "translating legal damage into money damages is, virtually by definition, an imprecise affair"). Should unfair acts or practices occur in, say, the allocation of vehicles or the setting of credit terms, there is no earthly reason why the effect of such favoritism cannot be satisfactorily quantified. The case law under the counterpart federal statute, the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221-1225, attests to the validity of this conclusion. See, e.g., Bob Willow Motors, Inc. v. Gen. Motors Corp., 872 F.2d 788, 798-99 (7th Cir. 1989) (approving estimation of damages resulting from discriminatory vehicle allocation); Randy's Studebaker Sales, Inc. v. Nissan Motor Corp., 533 F.2d 510, 517-18 (10th Cir. 1976) (endorsing damages approximation based on sales at other area dealers unaffected by the manufacturer's discriminatory practices).

Second, Santilli's argument totally overlooks the availability of injunctive relief. Under the statute as written, a dealer who fears unfair competition from a manufacturer's overlong ownership and operation of a competing dealership can seek

-13-

injunctive relief without having to show actual damages (or even threatened irreparable harm, as is normally required for an injunction). See Mass. Gen. Laws ch. 93B, § 12A. Rather, the plaintiff may obtain relief upon a showing that the defendant's violation may cause the plaintiff injury.[4] Id. We are unable to think of any sound reason why, in a situation such as this, the legislature would not have considered that an adequate remedy — and one that was preferable to providing a means for opportunistic dealers to make windfall gains without any showing that they were actually disadvantaged by a section 4(3)(k) transgression.

In a last-ditch effort to blunt the force of this reasoning, Santilli points us to the decision of the Massachusetts Appeals Court in Ricky Smith Pontiac. That case concerned a provision of chapter 93B that prohibits a manufacturer from "arbitrarily . . . grant[ing] . . . a franchise . . . to . . . an additional franchisee who intends . . . to conduct its dealership operations from a place of business situated within the relevant market area of an existing franchisee." Mass. Gen. Laws ch. 93B, § 4(3)(l). The defendant had granted a franchise in violation of this provision, and the court determined that the plaintiff's damages should be measured by calculating the profits lost due to the unlawful location of the competing franchise within its market

_____

[4]This remedial avenue was open to Santilli, but Santilli chose not to explore it.

area.  440 N.E.2d at 47.  Santilli attempts to draw a parallel, asseverating that just as Ricky Smith Pontiac was damaged by the unlawful insertion of competition into its market area, so Santilli has been damaged by the unlawful operation of Norwood Cadillac.

The parallel is inexact and, ultimately, unconvincing. The crucial distinction involves the divergence in the purposes of the two statutory provisions.  Section 4(3)(*l*) is aimed at geographic protection, shielding dealers from the arbitrary interposition of any additional same-brand competition within their market areas.  Am. Honda, 735 N.E.2d at 354.  Had that statute not been breached, the offending dealership in Ricky Smith Pontiac would not have existed at all.  Thus, the Ricky Smith measure of damages was appropriate because it put the plaintiff in as good a position as the plaintiff would have occupied had the transgression not occurred.

By contrast, section 4(3)(k) is aimed only at protecting dealers from unfair competition, specifically, the kind of unfair competition that vertical integration can bring about when manufacturers own and operate dealerships.  Applying the Ricky Smith measure of damages to claims brought under section 4(3)(k) would mix apples with oranges, and result in granting plaintiffs more protection than the legislature prescribed.  At least in this instance, this patchwork would put the complaining dealer in a better position that it would have occupied had the manufacturer

-15-

eschewed any involvement with the competing dealer. Ricky Smith Pontiac is, therefore, inapposite.

To sum up, we hold that a plaintiff seeking to recover damages for a violation of section 4(3)(k) must show not only a violation of the statute but also harm resulting from that violation. The latter showing requires competent proof that the plaintiff sustained a loss of money or property attributable to the manufacturer's unlawful ownership and operation of the competing dealership. That measure of harm is consistent with the statute's purpose to shield dealers from the "overweening economic power wielded by manufacturers." Tober Foreign Motors, Inc. v. Reiter Olds., Inc., 381 N.E.2d 908, 912 (Mass. 1978).

Santilli's claims against GM under sections 3 and 4(1) of chapter 93B (counts 2 and 4) need not detain us. As said, the lower court granted GM summary judgment on these counts, reasoning that when a specific provision of chapter 93B applies, a plaintiff may not also bring claims under the statute's generic provisions based on the same facts.

As to the section 3 claim, that reasoning is flawless. The statute makes it transparently clear that section 3 is only actionable insofar as there has been a violation of some subsection of section 4. See Mass. Gen. Laws ch. 93B, § 3(a) (prohibiting unfair methods of competition as defined in section 4).

-16-

Unlike the section 3 claim, the section 4(1) claim is not obviously vulnerable. Here, however, there is no need for us to test the district court's rationale. See Houlton Citizens' Coalition, 175 F.3d at 184 (explaining that the court of appeals may affirm an order for summary judgment "on any ground revealed by the record"). Even if Santilli could state an undisplaced claim for damages under section 4(1), any such claim would be subject, on these facts, to the injury requirement of section 12A. Accordingly, it would be doomed by the same lack of evidence of violation-induced harm that condemned count 1 (the claim under section 4(3)(k)) to an early demise.

## V. CONCLUSION

We need go no further. Insofar as money damages are concerned, the Massachusetts legislature has incorporated into the Dealers' Bill of Rights a principle of "no harm, no foul." It thus became Santilli's burden to demonstrate actual harm flowing from GM's ostensible violation of the statute. The district court correctly concluded that Santilli failed to carry this burden. It follows inexorably, as night follows day, that GM was entitled to summary judgment on counts 1, 2, and 4 of the complaint.

**Affirmed**.