Bahig F. BISHAY, Plaintiff, Appellant,

v.

AMERICAN ISUZU MOTORS,
INC., Defendant, Appellee.

Nos. 04–1392, 04–1393.

United States Court of Appeals,
First Circuit.

Submitted July 19, 2004.

Decided April 7, 2005.

Bahig F. Bishay, on brief pro se.

John R. Skelton, Andrew J. Gallo and Bingham McCutchen LLP, on brief for appellee.

Before SELYA, LIPEZ and HOWARD, Circuit Judges.

PER CURIAM.

These consolidated cases involve a challenge to the termination of two motor vehicle dealerships. Through separate

corporations of which he was the sole shareholder, plaintiff Bahig Bishay owned and operated a pair of Isuzu dealerships in Massachusetts. Defendant American Isuzu Motors Inc. ("Isuzu"), the American distributor of Isuzu motor vehicles, terminated the franchises in 2002 after the two corporations' bankruptcy proceedings were converted from Chapter 11 to Chapter 7. In his own name and on his own behalf, Bishay brought suit, contending *inter alia* that Isuzu had violated the "Dealers' Bill of Rights," Mass. Gen. Laws. ch. 93B, §§ 1–15. In a motion to dismiss, Isuzu protested that Bishay lacked standing because his chapter 93B claims belonged to the corporations. No suit was ever filed by the corporations themselves. Nonetheless, the Chapter 7 trustee, acting on behalf of the corporate estates, subsequently reached a settlement with Isuzu involving all possible claims arising out of the termination of the dealerships. Citing this development, the district court summarily dismissed.

The appeals raise a pair of overlapping questions: whether Bishay possesses independent standing to pursue a chapter 93B claim, i.e., whether he is a "motor vehicle dealer" authorized by the statute to bring suit; and whether his claims are coextensive with those available to the corporations and thus were extinguished by the trustee's settlement. Having concluded that the Massachusetts Supreme Judicial Court would resolve these matters in Isuzu's favor, we affirm.

## I.

Isuzu entered into "dealer sales and service agreements" with the two companies owned by Bishay. One contract, signed in 1993 and renewed in 1997, was with Massachusetts Automotive Group, Ltd. d/b/a Bishay Isuzu Corp. and involved an SUV dealership in East Walpole. The other, signed in 2000, was with Commonwealth Automobile Co. d/b/a Boston Truck Center and involved a truck dealership in Chelsea. The latter company apparently also operated a General Motors ("GM") truck dealership at the Chelsea site.

The two agreements, copies of which Bishay attached to his complaints, were virtually identical. Each listed the corporation as the "dealer." Each was signed by Bishay in his capacity as "president." Each identified the pertinent ownership and management, with Bishay listed as the sole owner of both corporations and as the manager of one dealership; a vice-president named Scott was listed as manager of the other. Each then stated:

This Agreement has been entered into by Distributor [Isuzu] in reliance upon, and in consideration of, the personal qualifications and representations with respect thereto of the above-named persons. In view of the personal nature of this Agreement . . ., this Agreement and the rights and privileges conferred on Dealer hereunder are not assignable, transferable or saleable by Dealer. Dealer agrees that any change in the ownership or operating management of Dealer specified herein requires the prior written consent of Distributor. . . . Distributor shall not unreasonably withhold its consent to any such change.

Along similar lines, each also provided that, "[s]ince this Agreement is in the nature of a personal service agreement and its continuation is conditioned upon Dealer being owned and managed as provided" in the section just described, Isuzu could terminate the agreement upon the death of an owner or manager.

By late 2001, the two corporations were experiencing cash flow problems. This was due mainly to the decision of General Motors Acceptance Corp. ("GMAC"), which had furnished "floor plan" financing for the purchase of vehicles from Isuzu, to cancel those credit arrangements. In Jan-

uary 2002, the corporations filed for Chapter 11 protection, with Bishay in court papers listing the dealer agreements as corporate assets. Over the next several months, Bishay personally attempted to keep the companies afloat by making and guaranteeing several loans and postponing certain rent collections. He also requested as an interim measure that the companies be allowed to purchase vehicles from Isuzu for cash, but Isuzu rejected this proposal. Meanwhile, a broker was hired to explore the possibility of selling the dealerships; several potential buyers were identified, but nothing materialized in that regard.

In June 2002, at the request of the United States Trustee, the cases were converted to Chapter 7, which resulted in closure of the dealerships. Even after that event, Bishay continued to seek permission to either sell the franchises or operate them himself. Isuzu instead moved for relief from the automatic stay in order to terminate the dealer agreements. That motion was allowed without opposition, and Isuzu subsequently terminated the agreements on fifteen days' notice. It relied, *inter alia*, on a contractual provision permitting such a step upon a dealership's failure to remain open for seven consecutive business days.

Bishay promptly filed a pair of nearly identical complaints in state court. He there alleged, *inter alia*, that the agreements were "personal service" contracts entitling him to bring suit on his own behalf; that Isuzu had improperly refused to accept cash payments for new vehicles during the Chapter 11 proceedings, which refusal had caused the conversion to Chapter 7; that Isuzu had improperly refused to allow Bishay to operate or sell the franchises; and that Isuzu had improperly terminated the agreements. Each complaint charged Isuzu with violation of chapter 93B, breach of contract, and breach of the implied covenant of good faith and fair dealing. Isuzu removed the cases to federal court on diversity grounds and then moved to dismiss, arguing *inter alia* that Bishay lacked standing. In opposition to that motion, one of Bishay's arguments was that the two corporations and the Chapter 7 trustee were either unable or unwilling to pursue any claims against Isuzu. Upon being informed that, in fact, the trustee was considering taking some action along these lines, the district court held the pending matters in abeyance.

In March 2003, four entities—the Chapter 7 trustee, Isuzu, GM and GMAC—reached a settlement of all possible claims arising out of these events. As between the trustee and Isuzu, the settlement described Bishay's suits and noted that some of his allegations "might form the basis of claims by the Debtors against Isuzu which could be asserted by the Trustee." It then provided that the trustee, on behalf of the debtor corporations, would release Isuzu from all claims involving:

> (i) the Dealer Agreements; (ii) the Debtors' status as authorized Isuzu ... dealers including all claims ... pursuant to M.G.L. c. 93B; (iii) the operation of the [two] dealerships pursuant to the Dealer Agreements, including[,] but not limited to, the Debtor[s'] post-petition operations; (iv) the conversion of the Debtors' Chapter 11 proceedings to cases under Chapter 7; and (v) any potential or proposed sale or assignment of the Debtors' dealership assets and operations.

In return, Isuzu was to pay $10,000 to the trustee, arrange for another $14,000 owed by another entity to be paid to him, and waive all possible claims against the corporations or their estates (including those for possible trademark violations).

The trustee and Isuzu then filed separate motions with the bankruptcy court seeking approval of the settlement. The

trustee stated, *inter alia,* that the proposed stipulation was "reasonable" and in the best interests of the estates and their creditors, that there were "serious questions" as to the viability of any claim against Isuzu (or the others), and that the estates lacked the funds needed to pursue any such litigation. Bishay objected to the settlement, but only along the lines that a further "accounting" was needed before its reasonableness could be determined. Over that opposition, the bankruptcy court endorsed the settlement in May 2003. Bishay appealed that ruling, but a separate district court judge affirmed in a January 2004 decision.

Meanwhile, following the bankruptcy court's approval, the parties in July 2003 returned to district court and requested a ruling on the pending motion to dismiss. The trustee also filed a supplemental report, explaining that he had entered into the settlement "[b]ased on [his] evaluation of the claims asserted by Mr. Bishay." After receiving supplemental memoranda, the district court summarily dismissed the actions in light of the "comprehensive settlement" that had been reached. Bishay now appeals, confining his attention to the chapter 93B claims.

## II.

Chapter 93B was designed in part "to curb the potentially oppressive power of automobile manufacturers and distributors in relation to their affiliated dealers." *Cadillac/Oldsmobile/Nissan Center, Inc. v. General Motors Corp.,* 391 F.3d 304, 306 (1st Cir.2004) (internal quotation marks omitted). The statute declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices." [1] Mass. Gen. Laws ch. 93B, § 3(a). It then spells out the forbidden actions—first proscribing conduct that is "arbitrary, in bad faith, or unconscionable," *id.* § 4(1), and proceeding to list twenty-one discrete acts and practices, *id.* §§ 4(2)-(4). One such listing renders it unlawful "to cancel or terminate the franchise or selling agreement of a motor vehicle dealer without good cause." *Id.* § 4(3)(e).

Chapter 93B's remedial section authorizes any "motor vehicle dealer" complaining of a violation to bring suit for equitable relief and damages. *Id.* § 12A. That term is defined in relevant part as "any person who, in the ordinary course of business, is engaged in the business of selling new or used motor vehicles to consumers or other end users." *Id.* § 1(h). The word "person" includes both a "natural person" and a "corporation." *Id.* § 1(n). Bishay takes the view that he was the "dealer" here, while Isuzu contends that the corporations occupied that role.

There is little case law addressing whether an individual owner/operator of a corporate dealership can qualify as a dealer under chapter 93B. Yet there is a good deal of case law addressing the analogous question under the Automobile Dealers' Day in Court Act (ADDCA), 15 U.S.C. §§ 1221–25, the federal counterpart to chapter 93B. The ADDCA permits an "automobile dealer" to bring suit against a manufacturer for failure "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." *Id.* § 1222. Much like chapter 93B, it defines "automobile dealer" as "any person, partnership, corporation, association, or other form of business enterprise . . . operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons." *Id.* § 1221(c). Given this linguistic overlap, the federal case law can properly be con-

---

**1.** As was the case in *Cadillac/Oldsmobile/Nissan Center, see* 391 F.3d at 306 n. 1, the version of chapter 93B in effect prior to a 2002 amendment controls here.

sidered here in construing chapter 93B. *See, e.g., George Lussier Enter., Inc. v. Subaru of New England, Inc.,* 393 F.3d 36, 47–48 (1st Cir.2004) (relying on federal law to define "coercion" in chapter 93B and related state statutes).

## III.

Relying principally on *Imperial Motors, Inc. v. Chrysler Corp.,* 559 F.Supp. 1312 (D.Mass.1983), Bishay frames the standing issue as follows. He acknowledges the general rule of corporate law that "when a corporation is injured, only the corporation, a receiver, or a stockholder suing derivatively in the corporation's name may sue to redress the injury." *Id.* at 1314 (citing *Vincel v. White Motor Corp.,* 521 F.2d 1113, 1118 (2d Cir.1975)). Yet he contends that an individual owner/operator nonetheless has personal standing when either of two circumstances is present: when the dealership corporation is for some reason unable or unwilling to bring suit against the manufacturer, *see, e.g., Kavanaugh v. Ford Motor Co.,* 353 F.2d 710, 717 (7th Cir.1965); or when the franchise agreement expressly relies on the individual's participation and thereby makes that person "essential" to the dealership's operation, *York Chrysler–Plymouth, Inc. v. Chrysler Credit Corp.,* 447 F.2d 786, 790 (5th Cir.1971). Bishay asserts that both exceptions—which we will call the "*Kavanaugh* exception" and the "*York* exception," respectively—are applicable here. We are unpersuaded.[2]

In *Kavanaugh,* it was "inconceivable" that the dealership corporation would seek ADDCA relief; all of its voting stock was owned by the manufacturer, and thus the latter in essence would have been suing itself. 353 F.2d at 717. Nothing of the sort is involved here. Far from facing any such impediment to suit, the corporations, via the bankruptcy trustee, have received valuable consideration for the release of any chapter 93B claims. Bishay nonetheless makes two arguments.[3] First, he asserts that the *Kavanaugh* exception applies because the Chapter 7 trustee lacked the power to control and operate the two corporations and because they have, in any event, been dissolved. Yet courts have regularly rejected individual standing under *Kavanaugh* where a bankruptcy trustee, acting on behalf of the corporation or its estate, has settled and released all ADDCA claims against the manufacturer. *See, e.g., Vincel,* 521 F.2d at 1120; *Bronx Chrysler Plymouth, Inc. v. Chrysler Corp.,* 212 F.Supp.2d 233, 238, 243 & n. 6 (S.D.N.Y.2002); *Milburn v. Ford Motor Co.,* 437 F.Supp. 7, 9–10 (E.D.Okla.1977). *But see John Peterson Motors, Inc. v. General Motors Corp.,* 613 F.Supp. 887, 903 (D.Minn.1985).

Second, Bishay contends that any chapter 93B claim by the trustee was time-barred and thus was effectively abandoned. In his view, the settlement was thus a sham, reflecting "an attempt by Isuzu to avoid Bishay's claims" and a "willingness by the bankruptcy trustee to take

---

**2.** We note that most, but not all, courts have seen fit to resolve this issue after evidentiary development rather than on the pleadings. *Compare, e.g., Lewis v. Chrysler Motors Corp.,* 456 F.2d 605, 607 (8th Cir.1972), *with, e.g., Northgate Motors, Inc. v. General Motors Corp.,* 111 F.Supp.2d 1071, 1075 (E.D.Wis. 2000). Yet Bishay has voiced no complaint in this regard, and the pertinent facts appear undisputed.

**3.** We will assume arguendo that the SJC would endorse the *Kavanaugh* exception, even though a contrary conclusion could arguably be gleaned from *Davidson v. General Motors Corp.,* 57 Mass.App.Ct. 637, 645–46, 786 N.E.2d 845 (2003), and its reliance on *Pearson v. Ford Motor Co.,* 68 F.3d 1301, 1303 (11th Cir.1995) (per curiam). The *Pearson* court chose not to follow *Kavanaugh* on the facts presented. *See id.* at 1303 n. 1 (endorsing lower court analysis reported at 865 F.Supp. 1504, 1508–10 (N.D.Fla.1994)).

a nominal $10,000 payment for the release of claims he had no ability to assert." Yet Bishay's reading of chapter 93B—to the effect that the limitations period in § 4(3)(e)(3) trumps that in § 14—is almost certainly incorrect, at least with respect to actions for damages. And as mentioned, both the bankruptcy court and the district court found the settlement to be reasonable. Bishay's reliance on the *Kavanaugh* exception is thus misplaced.

In turn, we think it reasonably clear that the SJC would reject personal standing under chapter 93B based on the *York* exception alone. That exception rests on the notion that the corporation and the individual owner/operator can become so intertwined as to properly be considered a single entity, justifying disregard of the corporate form. *See, e.g., John Peterson,* 613 F.Supp. at 903 (referring to dealership as "alter-ego" of owner/operator). Yet the majority of courts to address the issue have rejected this approach. *See, e.g., Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429, 440 n. 11 (9th Cir.1979) ("we are not persuaded to follow *York*"); *Bronx Chrysler Plymouth,* 212 F.Supp.2d at 239–43 (deeming *York* inconsistent with Second Circuit's *Vincel* decision); *Northgate Motors, Inc. v. General Motors Corp.,* 111 F.Supp.2d 1071, 1075–76 (E.D.Wis.2000); *Conroy Datsun Ltd. v. Nissan Motor Corp.,* 506 F.Supp. 1051, 1055–56 (N.D.Ill.1980); *Moorehead v. General Motors Corp.,* 442 F.Supp. 873, 880 (E.D.Pa.1977); *cf. Westside–Marrero Jeep Eagle, Inc. v. Chrysler Corp.,* 56 F.Supp.2d 694, 699–701 (E.D.La.1999)

(finding *York* "likely misguided" but still binding in circuit).

In support of the majority view, it is noted *inter alia* that the owner/operator, having chosen the corporate form, should ordinarily be held to that decision.[4] Especially where the corporation is able to pursue an ADDCA claim (either directly or through a bankruptcy trustee), no equitable reason is seen for disregarding that form and allowing individuals to bring private actions for their personal benefit. *See, e.g., Northgate Motors,* 111 F.Supp.2d at 1076. No convincing rebuttal has been offered by Bishay or the handful of cases that have relied on *York.*[5]

We therefore conclude that Bishay is not a "motor vehicle dealer" with standing to pursue chapter 93B relief on his own behalf. We also think it apparent that his claims, to the extent they were coextensive with those available to the corporations or the trustee, were extinguished by the settlement. In arguing that the settlement had no such preclusive effect, Bishay has insisted that his grievances were distinct from any corporate claims. While we need not pursue the matter, we note that such a finding arguably would render the *Kavanaugh* and *York* exceptions inapplicable— thereby providing further support for the conclusion that personal standing under chapter 93B is absent here.

*Affirmed.*

---

4. In the instant cases, the contractual language clearly contemplated the possibility of one or more individuals or a partnership serving as dealer. Bishay has not argued that Isuzu forced him in any way to set up the dealerships as corporations.

5. We note that both *John Peterson* and *Imperial Motors,* two of the cases to apply the *York*

exception, relied on the *Kavanaugh* exception as well. That was also true in *Rea v. Ford Motor Co.,* 497 F.2d 577, 584 (3d Cir.1974), at least according to two lower courts. *See Northgate Motors,* 111 F.Supp.2d at 1076; *Moorehead,* 442 F.Supp. at 879–81. Cases that have found personal standing in this context based on *York* alone are few and far between.